**STATE of Tennessee DEPARTMENT OF CHILDREN'S SERVICES**

v.

**A.M.H. and J.W.B.**

**In re A.B., J.B., C.H., B.H. (Minor Children).**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Assigned on Briefs Jan. 31, 2006.

March 6, 2006.

Permission to Appeal Denied by Supreme Court June 8, 2006.

Clifton L. Corker, Johnson City, Tennessee, for the Appellant, A.M.H.

Paul G. Summers, Attorney General and Reporter, and Elizabeth C. Driver, Assistant Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee Department of Children's Services.

## OPINION

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

This is a parental rights termination case. A.M.H. ("Mother") appeals the trial court's decision terminating her parental rights to her four children. On appeal, Mother argues, *inter alia,* that the "special judge" lacked judicial authority to terminate parental rights and that the evidence preponderates against the trial court's finding that grounds for termination exist and that termination is in the best interests of the children. We conclude that the "special judge" must be considered a *de facto* judge with authority to preside over this juvenile court matter and that the record contains sufficient evidence to support the trial court's decision. Therefore, we affirm.

### I. Background

Mother has four children: C.H. (born on July 15, 1999), A.B. (born on August 3, 2000), B.H. (born on October 25, 2001), and J.B. (born on January 4, 2003). The children first came into custody of the Tennessee Department of Children's Services ("DCS") in November 2003.

On February 2, 2005, DCS filed a petition to terminate parental rights of the father and Mother as to the children. Following a hearing on May 18, 2005, the trial court terminated Mother's parental rights based on proof of Mother's substantial noncompliance with the permanency plan and the removal of the children from Mother's home by court order for six months and Mother's failure to remedy the conditions that led to the children's removal. Mother argues the trial court erred in terminating her parental rights and that the "special judge" did not have the authority to adjudicate her case. The children's biological father, J.W.B., did not participate in the trial. His parental rights were subsequently terminated by default on June 29, 2005, and he did not appeal.

### II. Issues for Review

Mother raises the following issues, which we restate as follows:

(1) Whether a "special judge," appointed under T.C.A. § 17–2–118(f)(2), has the judicial authority to terminate parental rights;

(2) Whether clear and convincing evidence supports the termination of Mother's parental rights; and

(3) Whether the juvenile court correctly found that termination of Mother's parental rights was in the children's best interests.

### III. Standard of Review

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2059–60, 147 L.Ed.2d 49 (2000); *Hawk v. Hawk,* 855 S.W.2d 573, 578–579 (Tenn.1993); *Ray v. Ray,* 83 S.W.3d 726, 731(Tenn.Ct.App.2001). Although this right is fundamental and superior to claims of other persons and the government, it is not absolute. *State v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn.Ct.App.2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope,* 77 S.W.3d 137, 141 (Tenn.2002). It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon,* 776 S.W.2d 96, 97 (Tenn.Ct.App.1988)(*citing Stanley v. Illinois,* 405 U.S. 645, 651, 92

S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002)). However, parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. *Id.*

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, "severing forever all legal rights and obligations of the parent." T.C.A. § 36–1–113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S.Ct. 1388, 1412, 71 L.Ed.2d 599 (1982) (Rehnquist, J., dissenting)). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.* The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995). This most drastic interference with a parent's rights requires "the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn.1999).

In Tennessee, proceedings to terminate the parental rights of a biological parent are governed by statute. A party with standing seeking to terminate a biological parent's parental rights must first prove at least one of the statutory grounds for termination by clear and convincing evidence. T.C.A. § 36–1–113(c)(1). Secondly, it must be proven that termination of the parent's rights is in the child's best interests. T.C.A. § 36–1–113(c)(2). Because the decision to terminate parental rights affects fundamental constitutional rights, courts must apply a higher standard of proof when adjudicating termination cases. Therefore, to justify termination of parental rights, the party seeking termination must prove by clear and convincing evidence the ground (or grounds) for termination and that termination is in the child's best interests. T.C.A. § 36–1–113(c)(1) & (2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002).

The heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn.Ct. App.2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn.Ct.App.1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *In re C.W.W.*, 37 S.W.3d at 474, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn.Ct.App.2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn.Ct.App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn.Ct. App.2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R.App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court has seen and heard witnesses, especially where issues of

credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn.1999). Further, "[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct.App.1990), citing *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn.Ct.App.1974). After reviewing the trial court's specific factual findings to ascertain that the evidence does not preponderate against them, we must determine whether the elements required for termination are either clearly and convincingly established by the trial court's factual findings or are supported by a preponderance of the evidence. *In re S.M.*, 149 S.W.3d at 640. The trial court's conclusions of law are reviewed *de novo* and are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn.1993).

 Courts terminating parental rights are explicitly required to "enter an order that makes specific findings of fact and conclusions of law...." T.C.A. § 36–1–113(k). These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with T.C.A. § 36–1–113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn.2003).

### IV. Authority of Special Judge

 At the beginning of trial, Mr. James H. Beeler, a Kingsport area attorney, announced to the parties, "I'm hearing this case as Special Judge. This means that the appeal from this will go to the Court of Appeals and will not go to Judge Jones.[1] The appeal, therefore, will not be perfected within five days but it will be the 30–day appeal period for filing notice of appeal." Mother's counsel did not object, question Mr. Beeler's authority, or inquire into Judge Jones' absence. Mother now challenges the general authority of an unelected "special judge" to order the termination of her parental rights. She argues that because the issue goes to the heart of who can hear the case and jurisdiction, the issue is such that it cannot be waived for failure to have raised it at the trial court level. Mother contends that Tenn. R.App. P. 13(b) provides that "[t]he appellate court shall ... consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review...."

Section 16–15–209 of the Tennessee Code Annotated addresses the procedure to be followed when appointing a special judge to preside over a juvenile court matter. First, the judge who finds it necessary to be absent from court should attempt to locate a judge to serve by interchange or request a current, former or retired judge to sit as special judge. *See* T.C.A. § 16–15–209(a)(1)–(2). If necessary, the absent judge may apply for assistance from the Administrative Office of the Courts in finding a judge to sit as special judge. T.C.A. § 16–15–209(a)(3). "Only after exhausting the procedures set out in subdivisions (a)(1), (2) and (3), a judge may appoint a lawyer from a list, on a

---

1. Steven H. Jones is the duly elected judge of the Juvenile Court of Sullivan County, Division II, at Kingsport.

rotating basis, of lawyers that have been previously approved by the judge or judges of the district or county...." T.C.A. § 16–15–209(a)(4).[2] Where a lawyer is sitting as a special judge, the parties and counsel must be notified that the lawyer is a special judge who is sitting in the regular judge's absence. T.C.A. § 16–15–209(a)(4)(A). Then the parties must choose to proceed and have their case heard by the special judge rather than await the return of the regular judge. T.C.A. § 16–15–209(a)(4)(B); see State v. Posey, 99 S.W.3d 141 (Tenn.Crim.App. 2002).

Another provision relating to the appointment of a special judge is T.C.A. § 17–2–118, which provides that, for good cause, a state or a county judge of a court of record may appoint a substitute judge. Good cause includes illness, physical incapacitation, vacation, or absence from the city or judicial district related to the judge's judicial office. T.C.A. § 17–2–118(a). The substitute judge must possess all of the qualifications of a judge of the court in which the substitute is appointed. T.C.A. § 17–2–118(b). A consent form must be signed by all litigants, and no substitute judge may be appointed for a period of more than three days. T.C.A. § 17–2–118(c) & (e). These requirements of the statute do not apply, however, where a judge finds it necessary to be absent from holding court and appoints as a substitute judge:

(1) A duly elected or appointed judge of any inferior court; or

(2) A full-time officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile referee, ... who is a licensed attorney in good standing with the Tennessee supreme court. Such judicial officer shall only serve as a special judge in matters related to that officer's duties as a judicial officer....

T.C.A. § 17–2–118(f).[3] Mother acknowledges that Mr. Beeler has served as a referee in juvenile court in many cases.

In In re Valentine, 79 S.W.3d at 545, the Tennessee Supreme Court held that the appointment of a special judge in a termination of parental rights proceeding does not violate the Tennessee Constitution, reasoning as follows:

Because Tenn.Code Ann. § 17–2–118(f)(2) provides reasonable restrictions upon the appointment of special judges, the statute does not give elected judges unfettered discretion.... Her constitutional argument based on that premise therefore must fail. Moreover, [Mother] does not argue that the elected judge's absence was not "necessary" in this case. Accordingly, we hold that the appointment of a juvenile court referee as a special judge under Tenn.Code Ann. § 17–2–118(f)(2) does not contravene the provision in Article VI, § 4 of the Tennessee Constitution requiring that a judge be elected.

Id. Clearly, a termination of parental rights proceeding is a matter related to a juvenile court referee's duties as a judicial officer. Therefore, these statutes authorize the elected juvenile court judge to appoint a juvenile court referee as special judge in such a proceedings and do not contravene the provision in Article VI, § 4 of the Tennessee Constitution requiring that a judge be elected.

In Ferrell v. Cigna Property & Cas. Ins. Co., 33 S.W.3d 731 (Tenn.2000), the Supreme Court emphasized that "the absence

---

2. Counties of certain size may appoint a special substitute judge or judges to serve in the juvenile court in the absence of the elected judge or judges. T.C.A. § 16–15–209(h)(1).

3. Another very similar statutory provision is codified at T.C.A. § 17–2–122.

must be necessary," and indicated that "[a] judge may not use mere convenience as a basis for being 'absent from holding court.'" *Id.* at 737. The Court concluded that a trial judge should appoint a judicial officer such as a juvenile court referee to act as a special or substitute judge in his or her absence only if the trial judge determines it is not possible either to interchange pursuant to T.C.A. § 17–2–202 or to obtain assistance from another presiding judge or from the Supreme Court pursuant to T.C.A. § 16–2–509(e). *Id.* at 738. The Court specified that any order of appointment of a judicial officer as a special judge "should be either for a definite period of time or for a specific case" and that a "standing order" appointing a judicial officer "to hear an entire class of cases is not appropriate." *Id.* at 739.

While the *Ferrell* Court found that the proper procedure for appointing a special judge had not been followed in that case, the Court, relying upon *State ex rel. Newsom v. Biggers,* 911 S.W.2d 715, 718 (Tenn. 1995), determined reversal was not required because the clerk and master in that case was a *de facto* judge, "one acting with color of right and who is regarded as, and has the reputation of, exercising the judicial function he assumes." Thus, the Court held as follows:

> [T]he Clerk and Master unquestionably was acting under color of right. Two statutes specifically authorize the appointment of clerks and masters as special judges. Moreover, the parties consented to the appointment and have not objected on appeal.

*Ferrell,* 33 S.W.3d at 739. Reversal because of improper procedure was also avoided in *In re Valentine,* as the Supreme Court found that any objection to the procedure by which a special judge had been selected had been waived, but noted that "[a]fter our decision in *Ferrell,* special judges should confirm that their authority to preside is contained in the record." 79 S.W.3d at 545 n. 5.

In the record before this court, there is no order appointing Mr. Beeler as a special judge and no evidence regarding whether the absence of Judge Jones was "necessary." Mr. Beeler did not articulate the basis for his authority. Indeed, this court's awareness of Mr. Beeler's service as a juvenile court referee was gleaned from Mother's brief, and she does not indicate whether Mr. Beeler is a "full-time officer of the judicial system." Accordingly, pursuant to the directives provided by our Supreme Court in *Ferrell* and *In re Valentine,* we find that the trial court did not follow the proper procedure for appointing a special judge, and the record is inadequate to support Mr. Beeler's authority to serve as a special judge.

 It is well settled, however, that issues not raised at trial will generally not be considered for the first time on appeal. *In re Adoption of E.N.R.,* 42 S.W.3d 26, 32 (Tenn.2001). Mother did not appeal on the grounds that Judge Jones' absence was unnecessary or that the paperwork concerning Mr. Beeler's appointment was improper or lacking; thus, these issues are deemed waived. We find that in this case, Mr. Beeler served as a *de facto* judge of the Juvenile Court of Sullivan County and his acts are binding on the parties. *Biggers,* 911 S.W.2d at 718. Accordingly, Mother is not entitled to relief on this issue.

## V. Grounds for Termination

 We next address whether the trial court erred in finding that there were statutory grounds for terminating Mother's parental rights. As long as one statutory ground for termination is established by the facts in this case and termination is in the best interests of the children, the trial

court's decision will be sufficiently supported. *In re D.L.B.*, 118 S.W.3d at 367.

### A. Compliance with Permanency Plan

One of the grounds found to exist by the trial court was that Mother had failed to comply with her responsibilities under the permanency plan, a written plan that sets out requirements to achieve family reunification or other appropriate goals, such as adoption or permanent foster care. Tenn.Code Ann. §§ 37–2–402(8), –403(a)(1). Pursuant to T.C.A. § 36–1–113(g)(2), parental rights may be terminated upon proof by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care. . . ." The requirements must be stated in specific terms and must be reasonably related to the specified goal. T.C.A. § 37–2–403(a)(2)(A). Substantial compliance with the statement of responsibilities in a child's permanency plan is essential. However, substantial noncompliance will not be found based on minor, trivial, or technical deviations from a permanency plan. *In re M.J.B.*, 140 S.W.3d 643, 655–657 (Tenn.Ct.App.2004). In this case, Mother's responsibilities were to complete an alcohol and drug assessment; maintain appropriate, drug-free housing; participate in a parenting assessment and attend parenting classes; and maintain financial stability by cooperating with public assistance programs and acquiring and maintaining employment for a minimum of six months.

Mother contends the evidence presented to the trial court revealed that she had received therapeutic supervised visits and had regularly visited with her children, had attended Indian Path Pavilion for inpatient drug treatment, and, ultimately, successfully addressed her drug problem. Mother further claims she has obtained stable and suitable housing and employment.

A review of the record reveals that approximately one month after the children entered foster care, Mother admitted to the caseworker that she was still using drugs. Rebuking attempts by DCS to help, Mother insisted that she did not need any assistance and could overcome her addictions to crack cocaine and marijuana on her own. She eventually entered the drug rehabilitation program at Indian Path Pavilion, but only stayed for one week. Mother tested positive for cocaine and marijuana on three occasions in 2004: April 22, June 16 and September 16. She failed a random drug screen on January 26, 2005. At other times, Mother refused to take the drug screens, sometimes even admitting that she would fail. After the termination petition was filed, Mother claimed that she had ceased using drugs and had successfully completed an informal rehabilitation program with a friend. The friend, however, did not testify at trial.

During the relevant eighteen-month period, Mother provided DCS with at least six different addresses. For about three months after her children were removed, Mother testified that she had lived in the Model City Apartments with a boyfriend who sold crack cocaine from the residence. Mother and her boyfriend then moved into a motel room paid for with the proceeds from drug sales. After the boyfriend was arrested for selling drugs, Mother lived with friends. At one point, DCS made arrangements for Mother to be admitted to a local women's shelter, Hope Haven, where she would have received alcohol and drug counseling and employment assistance along with housing. Mother refused such help, however, claiming that she had a place to stay. At the time of trial, she had been renting a two-bedroom trailer for

two weeks, but could not recall the name of the landlord. The caseworker testified that Mother had given him a telephone number, but that he had been unable to contact her to arrange a home visit. Additionally, Mother noted that a former boyfriend who was incarcerated at the time of the hearing had given her the use of his car and cell phone. Because Mother did not possess a driver's license, however, she testified that a friend acted as her chauffeur.

Mother did complete a parenting assessment, as DCS arranged for Child and Family Services ("CFS") to perform a parenting assessment during Mother's visits with her children. CFS then began therapeutic visits with Mother, but closed the case after she stopped coming to visits. These therapeutic visits were restarted when Mother resumed visitation, but later her case was closed a second time for noncompliance. Scheduling the parenting classes was Mother's responsibility, but she refused to make the arrangements. The caseworker noted that two weeks prior to the originally scheduled trial date of March 30, 2005, Mother requested that he sign her up for parenting classes. DCS provided her with information regarding the classes, but refused to pay for them, since Mother had failed to attend the classes to which the Department had referred her on two previous occasions. Mother testified that she had attempted to take the required parenting classes, but had been advised she would need to wait until June to start them.

Mother had also informed the caseworker that she was employed, but never provided him requested pay stubs to verify her claim. At trial, Mother testified that she had been working at a restaurant for about a month and produced a pay stub for the two-week pay period ending May 8, 2005. Dated May 16, 2005, the pay stub reflected Mother had worked 19.66 hours for a total of $110.88. Additionally, the pay stub revealed she had earned approximately $50 during the previous pay period. On cross-examination by the DCS attorney, Mother insisted that she was still employed at the restaurant and had last worked on May 15, 2005, the Sunday before the hearing. Upon further questioning by the guardian ad litem however, Mother admitted that she no longer worked at the restaurant, having quit because she was not getting enough hours.

At the time of the hearing, Mother had been receiving $149 in food stamps for about three months, based on having no income. The rent for the trailer was $325 a month; she opined that her monthly expenses for electricity would be between $50–$60 and water would be $15–$20. Mother testified that she planned to pay these bills by regaining employment at the restaurant, where she believed she could get a day shift position and be able to work more hours than she had been given on the night shift.

We conclude that the responsibilities denoted in the permanency plan were reasonable and related to remedying the conditions that necessitated foster care placement for Mother's children. Clear and convincing evidence supports the findings by the trial court that Mother did not substantially comply with the requirements that she obtain assistance with her drug addiction, maintain appropriate, drug-free housing, complete parenting classes, and maintain financial stability and employment. Therefore, the trial court properly relied on this ground to terminate Mother's parental rights under T.C.A. § 36–1–113(g)(2).

### B. Failure to Remedy Persistent Conditions

■ The second ground relied on by the trial court to terminate Mother's pa-

rental rights was T.C.A. § 36–1–113(g)(3)(A), which provides as follows:

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist:
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

At the time of the hearing, Mother's children had been in DCS custody since November 2003, well over the six months required by T.C.A. § 36–1–113(g)(3)(A). Mother's drug abuse was the main condition that led to the removal of her children. As a result of Mother's situation, DCS had determined the children were severely lacking in supervision, were receiving poor care, were residing in filthy conditions, were dirty, and were improperly dressed for the weather conditions.

The trial court found that clear and convincing evidence established that the conditions that caused the children to come into custody still persisted and were unlikely to be remedied at an early date. The special judge concluded that Mother's drug addiction, a factor in the children's

removal, continued throughout the time they were in custody.

A review of the evidence reveals that Mother had continued to use drugs,[4] had only obtained housing two weeks prior to the termination proceedings, and did not have a job. These conditions support the conclusion that a reasonable probability existed that the children would be subjected to further neglect and that there was little likelihood the conditions would be remedied at an early date. T.C.A. § 36–1–113(g)(3)(A)(i) & (ii); *see In re Z.J.S.*, No. M2002–02235–COA–R3–JV, 2003 WL 21266854 * 16 (Tenn. Ct.App. M.S. filed June 3, 2003). Mother's children were all living together in a therapeutic foster home where the foster parents wanted to adopt them. Thus, the continuation of Mother's parental rights would adversely affect the children's chances of early integration into a safe, stable and permanent home. T.C.A. § 36–1–113(g)(3)(A)(iii). We find that the requirements of T.C.A. § 36–1–113(g)(3)(A) have been proven by clear and convincing evidence, and the trial court properly terminated Mother's parental rights on this ground.

## C. Best Interests of the Children

In addition to finding by clear and convincing evidence that statutory grounds exist to terminate parental rights, the court must also find that the termination is in the children's best interests. T.C.A. § 36–1–113(c)(2). To make the latter finding, the court shall consider, but is not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to

---

4. While Mother claims her last drug screen had been "clean," it did reveal the presence of marijuana.

be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

T.C.A. § 36–1–113(i).

This court stated in *In re Audrey S. & Victoria L.*, 182 S.W.3d 838 (Tenn. Ct.App. 2005) as follows:

[A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests.

\* \* \*

Ascertaining a child's best interests does not call for a rote examination of each of Tenn.Code Ann. § 36–1–113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d at 878.

DCS established that Mother had failed to maintain stable housing and continued to abuse drugs, which created conditions that would be unsafe for the children to be in the home and rendered her unable to care for the children in a safe and stable manner. T.C.A. § 36–1–113(i)(1), (2), (7). In addition, Mother did not maintain consistent visitation with her children. T.C.A. § 36–1–113(i)(3). She missed many scheduled visits and arrived late or left early for others. She made no visits for the months of October, November, and most of December 2004. Of the thirty-five visits scheduled between December 2003 and December 2004, Mother arrived on time for only twelve. Of the remaining twenty-three visits, she arrived late or left early for nine and did not show at all for eleven. Mother was not allowed to visit on three occasions because she did not call the day before to confirm the visit, as she was

required to do. Additionally, Mother arrived at one visit looking ill and so tired she could not keep her eyes open, did not show for the visit scheduled two days before Christmas in the first month her children were in custody, and did not visit at all between September 22, 2004, to December 29, 2004. On the day a visit was planned to be a birthday party for her eldest child, Mother arrived *sans* cake or presents. Further, Mother did not pay child support consistent with the child support guidelines. T.C.A. § 36–1–113(i)(9). In view of the fact that the children were doing very well in the same foster home with foster parents who wanted to adopt all four, had no health issues, were bonded with their foster parents, and appeared to be happy and progressing in a timely manner, we agree with the trial court that "it would be disastrous to remove these children from where they are and place them back with the mother." *See* T.C.A. § 36–1–113(i)(5). The testimony at the trial and the record before us support the trial court's determination that termination of Mother's parental rights was in the best interests of her children.

### VI. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court and remand for further action consistent with this opinion. Costs on appeal are adjudged against the Appellant, A.M.H.