IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on briefs January 9, 2007

**STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES
v. F.R.G.**

**Appeal from the Juvenile Court for Sullivan County
No. J30,701     Steven H. Jones, Judge**

---

**No. E2006-01614-COA-R3-PT  - FILED FEBRUARY 16, 2007**

---

The trial court terminated the parental rights of F.R.G. ("Mother") and R.K.B. ("Father") with respect to their minor child, C.G.B. ("the child") (DOB: December 31, 2003), upon finding, by clear and convincing evidence, that grounds for terminating their parental rights existed and that termination was in the best interest of the child.  Mother appeals, arguing procedural defects in the trial court's termination of her parental rights.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

C. Brad Sproles, Kingsport, Tennessee, for the appellant, F.R.G.

Robert E. Cooper, Jr., Attorney General and Reporter, and Douglas Earl Dimond, Senior Counsel, General Civil Division, for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

**I.**

The child was born approximately three months premature on December 31, 2003. According to hospital records, Mother's pregnancy "was complicated by cigarette smoking and the use of narcotics and Cocaine and benzodiazepines."  At the time of the child's birth, Mother tested positive for Cocaine, opiates, and benzodiazepines.  The child was born addicted to Cocaine and other narcotics.  In the months that followed her birth, the child experienced many medical problems, including respiratory failure, pulmonary hypertension, and significant withdrawal.

The Tennessee Department of Children's Services ("DCS") removed the child from the custody of Mother on January 13, 2004, *i.e.*, two weeks following the child's birth. DCS's petition for temporary custody cites Mother's drug use and the fact that the child was born addicted to drugs as evidence to support the child's removal from Mother's custody. On February 2, 2004, DCS developed a permanency plan with the goal of reunifying the child with her parents.[1] Among other things, the plan required Mother and Father to complete an alcohol and drug assessment; to follow all resulting recommendations; to submit to random drug tests; and to not possess any illegal drugs or violate any laws or court orders. The plan also required Mother and Father to participate in parenting assessments; to comply with any resulting recommendations; to attend the child's medical appointments whenever possible; and to follow any recommendations made by medical professionals treating the child. Mother and Father both refused to sign the permanency plan developed by DCS. The plan was later approved and ratified by the trial court.

On July 16, 2004, the trial court entered an agreed order adjudicating the child to be dependent and neglected. The order provided that the child was to be placed in foster care with her maternal aunt and uncle, and that Mother would be permitted supervised visitation with the child. The court enjoined Father from having any contact with the child in light of an altercation in which Father verbally abused two DCS workers. The order further directed DCS to schedule random drug tests for both Mother and Father.

Two weeks later, during one of Mother's scheduled visitations at the child's foster home, Mother, without permission, left the premises with the child. Mother then got into a waiting car driven by Father, who, as mentioned in the previous paragraph, had been ordered by the trial court to have no contact with the child. Mother also left the premises with two cell phones belonging to the child's foster parents. The police eventually located the child at her maternal grandmother's house in Virginia. Mother told the police that she took the child for the child's own welfare, indicating that she believed there were physical signs suggesting that the child was not receiving proper medical care. As a result of this incident, Mother and Father were charged in criminal court with Especially Aggravated Kidnapping and Theft under $500. Thereafter, the trial court entered a restraining order against Mother and Father, prohibiting either parent from having any contact or communication with the child. The criminal charges against Mother and Father were still pending at the time of the termination hearing in this matter.

Mother and Father failed to cooperate with DCS over the next few months. Christina Butler, the principal DCS caseworker assigned to the child's case, testified that Mother and Father failed to attend all seven of the random drug screens scheduled for them. Ms. Butler stated that she would schedule the tests with a local hospital and call Mother and Father with the details of the tests (*i.e.*, the date, the location, who to ask for when they arrived at the location, etc.). Ms. Butler testified that

---

[1] At the time of the child's birth, and for some time thereafter, Mother was married to another man. Therefore, Father is not listed as the child's legal father in the permanency plan. Father is, however, listed as the putative father in the plan. Later DNA tests conclusively established that Father was the biological father of the child. At the time of the hearing below, Mother and Father were not married but were living together and planning to marry one another in the future.

she rarely got Mother or Father on the phone, and that she would normally leave a message for them with the details of the scheduled test. Ms. Butler also testified that Mother and Father failed to complete a drug and alcohol assessment and a parenting assessment despite numerous attempts by DCS to schedule such assessments.

On November 17, 2004, DCS filed a petition to terminate the parental rights of Mother and Father. As grounds for termination, DCS's petition alleged (1) substantial noncompliance with a permanency plan; (2) persistent unremedied conditions; and (3) severe child abuse as defined by T.C.A. § 37-1-102.[2]

On August 24, 2005, Juvenile Court Referee James H. Beeler presided over an evidentiary hearing in the case. On that day, Referee Beeler announced that he was hearing the case as a Special Judge, rather than in his capacity as Referee, and that any appeal of his decision would therefore go directly to the Court of Appeals.[3] Prior to the first witness taking the stand, Mother requested that Referee Beeler continue the termination hearing until some date after October 3, 2005, which was, at the time, the date the criminal court was scheduled to try Mother on the related kidnapping and theft charges. Mother argued that, if the termination hearing went forward prior to the criminal trial, she would be at a disadvantage in preparing and presenting her defense at the termination hearing because she would be forced to refrain from testifying for fear that she would give incriminating testimony that could be used against her in the criminal trial. Referee Beeler denied Mother's request, noting (1) that it was not certain that the criminal trial would in fact occur on October 3, 2005, and (2) that there had already been "various continuances for various reasons" granted in the termination case. Mother chose not to testify at the termination hearing.

Referee Beeler heard testimony from Ms. Butler, a second DCS caseworker assigned to the child's case, the police detective assigned to investigate the taking of the child to Virginia, and the child's maternal grandmother. At the conclusion of the hearing, Referee Beeler made the following findings from the bench:

---

[2] T.C.A. § 37-1-102(21) (2005) defines "severe child abuse," in relevant part, as follows:

> (A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death or the knowing use of force on a child that is likely to cause great bodily harm or death;
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect the child from such conduct; . . .

[3] An appeal from a juvenile matter heard by a Special Judge goes directly to the Court of Appeals. On the other hand, T.C.A. § 37-1-107(d)-(f) (2005) provides that, in juvenile matters heard by a Juvenile Court Referee, the parties and the Juvenile Court Judge have the option of requesting a rehearing before the Juvenile Court Judge (*i.e.*, prior to appealing to the Court of Appeals). T.C.A. §§ 16-15-209 (Supp. 2006) and 37-1-159(g) (2005)

It just seems to me to be absolutely abundantly clear, clear and convincing that [Mother] was utilizing drugs and had been on a sustained basis prior to the birth of the child, and the child was born with that situation. . . .I don't have any question. Besides, I notice there was a continuance in this case once upon a time because there was an alleged need of doctor's testimony and depositions, and those were not taken. So, the proof I have is what I have in front of me, and it appears clear that drugs were there.

It also appears clear to me that [Father] knew and contended himself to be the father from the start. From the time the child was taken, he was mentioned in the very first Permanency Plan. He has not participated in anything he's supposed to do. Neither has [Mother]. There's been conscious evasion of drug tests and too many of them to be accidental, too many to be excused. They were evading the drug tests. That's just absolutely clear. Both of them, seven (7) drug screens didn't go. One (1) the lady went out to try to – was going to pick them up and take them there, and they refused to go.

They've not had stable housing. From listening to everybody, they've just went here and there and back and somewhere else. No stable housing. I've heard no testimony of jobs or anything of that nature. In addition, the mother is in here complaining now that she has injuries which – or some problems which puts her in a wheelchair. For the record, I don't believe I've ever seen her in here in a wheelchair before. And her being in a wheelchair would also affect her ability to take care of the child. There's been a refusal on their part to acknowledge fault in this and been no showing of stable income, no showing of any ability to take care of the child, no participation in the parenting assessment, nothing. There seems to be absolutely no improvement.

As far as support, yeah, it's true that Support Enforcement didn't order a support entry, but it did that on the express realization that termination was coming down the road and apparently at the request of attorneys for the parents. So, I don't really feel that that excuses them from anything. And besides that, they've never in the whole child's life from the testimony I've heard provided anything other than one pack of diapers and One Hundred Dollars ($100.00), and that's it. They've refused to give medical releases, again failure to comply with Parenting Plan.

There's been conduct or threats to [DCS] workers, resulting in police being called there and arrests. Been some pretty clear testimony and admissions that they took the child from, from the foster care home, and they're now charged with aggravated kidnapping. And I don't care if she did think she did have a reason, that's still no, no justification for kidnapping or taking the child[] in violation of No-Contact Orders out of this Court. So, I don't see too much to say.

I think the very serious nature of the child at birth, which is cardiac distress, respiratory distress, and there's a lot – I've read through part of the medical records. It's pretty disturbing. The child was in pretty bad shape. It was a very serious situation from the start and has continued to be a serious situation all the way through. The parents have absolutely not complied with anything at all. They've done absolutely nothing. They've spent most of their time avoiding doing what they were supposed to do. And I think they both really probably know it.

So basically, I find that the conditions which prompted the removal were certainly very, very severe and that removal was absolutely necessary. I find that the conduct of the parties since that time have indicated no desire at all to change their course of action, none at all. And I find that they failed to support the child, and that what little they did do was very, very token and certainly was not meaningful child support.

I find that the drug addiction at birth and the use of the drugs during pregnancy does constitute severe child abuse within the meaning of [T.C.A.]. I find that the – all of this is on clear and convincing evidence, parental rights should be terminated. The child has been removed from the home of [Mother and Father] by Order of the Court for more than six (6) months and that the condition which led to the removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which therefore prevents the child's safe return to the care of [Mother and Father] still, persists and that there is little likelihood "– actually, I find that there is no likelihood" that these conditions will be remedied at an early date so that the child could be safely returned to [Mother and Father] in the near future. And I do firmly find and believe that the continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home. It's my feeling if this child had not been out of these people's care, the child might not be alive today. And I find all

-5-

of this by clear and convincing evidence. And I, I think that it's absolutely in the best interest of the child that parental rights be terminated.

Counsel for DCS thereafter prepared and submitted a final order incorporating the findings set forth above. Referee Beeler declined to sign the drafted order because his findings from the bench, and the resulting order drafted by DCS, lacked detailed findings of fact with respect to the nine statutory factors to be considered in determining whether termination is in the child's best interest. *See* T.C.A. § 36-1-113(i)(1)-(9) (Supp. 2006).

On March 22, 2006, Referee Beeler held a second hearing to explicitly address the statutory best interest factors. In the intervening time from the first hearing in August, 2005 to this second hearing, this Court decided the case of ***State Dept. of Children's Servs. v. A.M.H.***, 198 S.W.3d 757 (Tenn. Ct. App. 2006), *perm. app. denied*, June 8, 2006. Referee Beeler also presided over the termination hearing in that case. ***Id.*** at 762. As in the case currently before us, Referee Beeler stated at the beginning of the hearing in the ***A.M.H.*** case that he was hearing the matter as Special Judge, rather than in his capacity as Juvenile Court Referee. ***Id.*** In ***A.M.H.***, we stated that Referee Beeler did not have the authority to serve as Special Judge because the record lacked evidence establishing that the trial court had followed the statutorily prescribed procedure for appointing a Special Judge. ***Id.*** at 764. This issue, however, was deemed waived in the ***A.M.H.*** case because it was raised for the first time on appeal. ***Id.***

In response to our decision in ***A.M.H.***, Referee Beeler stated the following at the beginning of the March 22, 2006 hearing in the instant case:

> I had announced previously [at the August 24th hearing] that I would be hearing this case as Special Judge, but given the contents of a Court of Appeals opinion that came down recently, I'm going to make the decision not as Special Judge but as Referee, which means that any appeal would go to Judge Jones[4] within five days of the date of the decision if anybody was dissatisfied with it.

(Footnote added). Referee Beeler then went on to make the following detailed findings with respect to each of the nine best interest factors:

> The first [factor] is whether the parent or guardian has made such an adjustment of circumstance, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian. I don't find that to be the case. This is the case in which the child was taken away, and actually I think criminal charges were

---

[4]The Honorable Steven H. Jones is the duly elected judge of the Juvenile Court for Sullivan County, Division II, at Kingsport.

filed I believe or discussed anyway, criminal charges, kidnapping. This is also the case in which the attorneys were allowed to withdraw, one of them because of an alleged robbery, if I recall right. It doesn't appear that there's been any cooperation or effort to change on the part of the parties at all, and, therefore, I don't find it in the best interest to be in their home.

The next [factor] is whether the parent or guardian has failed to make a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not appear reasonably [possible]. I find that they haven't made that lasting adjustment. This is the case where they – I believe there was some papers thrown at the guardian ad litem in one of the joint meetings, if I recall right. This is also the one where they have refused to participate in the various tests and counseling they were supposed to be in. And keep in mind, too, that this child was born drug addicted. Drug screens that were set up the parties wouldn't attend to. The only thing they did was admit drug use in the past. They did. They've never acknowledged fault in this situation. Like I said, it's important because the child was born several weeks premature. So I don't find any change on their part.

Maintained regular visitation or other contact with the child. Basically, they kidnapped the child. Apparently these charges were made. They were charged with aggravated kidnapping one that was set for trial in October. I don't know what the result of that was. The visits were stopped because of the conduct of the parties. I don't find that they've done anything to maintain that visitation. They've done everything to thwart it.

Whether a meaningful relationship has otherwise been established between the parent or guardian of the child. I don't think there is a meaningful relationship at all. Given the age of the child and the conduct of the parents, I don't, don't find anything of meaningful relationship there.

The effect that a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical

condition. I think any change would be [negative].[5] Like I said, premature, drug addicted when born. Possibly cocaine involved. Other drugs. The child was on a morphine drip in the hospital. The child's circumstances just certainly were not taken care of. Pre – hadn't had any medical care for several months prior to it. The note says, "[Mother] says she's not seen a doctor since she was 5-months pregnant." The child was born in cardiac and respiratory distress. So it seems to me pretty obvious that any change on this child would be [negative] as to medical, psychological, emotional.

Whether the parent or guardian or other person residing with parent or guardian has shown brutality, physical, sexual, emotional or psychological abuse or neglect toward the child or another child or adult in the family or household. When a child is subjected to drug use by the parent to the extent that the child is born premature and drug addicted and is suffering from serious medical problems, cardiac and respiratory, I feel that that's physical abuse of the child.

Whether the physical environment of the parent or guardian's home is healthy or safe, whether there is criminal activity in the home, whether there's use of alcohol or controlled substances as may render[] the parent or guardian consistently unable to care for the child in a safe, stable manner. I think these parties have shown at all times from the very start that they are not going to provide a safe, healthy environment in the home. I think the parties have continuously involved themselves in criminal activities, and I, I think they have endangered the child by that, and there's been such use of drugs in the home as to the parents unable to care for the child. I, I find all of that under [factor] 7 to be negative as to the parents. They've not done anything positive about it.

Eight, whether the parents or guardian's mental or emotional status would be detrimental to the child and prevent the parent or guardian from effectively providing safe, stable care and supervision for the child. I don't know exactly much about their mental ability or such as that, but it's pretty obvious that they have made no changes and don't intend to make any changes and that the drugs and criminal

---

[5]Referee Beeler actually stated from the bench that he thought "any change" in caretakers would be "positive." However, after counsel for DCS pointed out that the "effect a change of caretakers and physical environment" in this factor refers to a change *from the foster home back to the parent*, rather than a change *from the parent to the foster home*, Referee Beeler corrected himself by stating that such a change "would be decidedly negative."

conduct of the parties is going to be ongoing. So I don't find anything meritorious to them under that.

Whether the parent or guardian has paid child support consistent with child support guidelines. That's the last one. I believe, if I remember right, I don't believe there was any child support paid. I don't believe there was a Court Order if I recall. I'm trying to make sure that I know what I'm talking about. Support Enforcement ordered no support, but I don't think that totally excludes a parent from taking care of their child. So whether it was ordered or not, I find they haven't paid any child support, and I don't find any redeeming factors. I've seldom seen anybody conduct themselves as oppositional and obstructive and destructive as these parents have.

So I find that it is by far in the best interest of the child that parental rights be terminated and that the child be placed for adoption, and all of the matters that I've discussed here, while they play a part in the best interest, they also play a part in the findings of grounds for the termination. So the findings that were stated in [the order drafted by DCS], they were in the record before, they're still, still valid, but additionally, these other conditions of best interest are also there.

(Footnote added).

On May 10, 2006, the trial court entered a Final Decree of Guardianship, which was approved and signed by Judge Jones.[6] The court's decree notes that although Referee Beeler initially advised the parties that he was hearing the case as a Special Judge, "this was no longer the case." The decree states that there is clear and convincing evidence to support (1) substantial noncompliance with a permanency plan, (2) persistent unremedied conditions, and (3) severe child abuse as defined in T.C.A. § 37-1-102 as grounds for the termination of Mother and Father's parental rights. *See* T.C.A. § 36-1-113(g)(2), (3)(A)-(C), (4). The decree then sets forth Referee Beeler's detailed findings with respect to each best interest factor, all of which weigh in favor of the termination of Mother and Father's parental rights. From this decree, Mother appeals.

---

[6]At one point in her brief, Mother appears to suggest that the final order in this case is improper because it lacks Referee Beeler's signature. This argument, to the extent that it is made, is without merit. Given Referee Beeler's finding from the bench, we know that the final order signed by Judge Jones in this case accurately reflects the findings and recommendations made by Referee Beeler. Mother fails to cite authority, and we are not aware of any, that requires the Juvenile Court Referee to sign the final order that is approved and entered by the Juvenile Court Judge.

II.

A.

Mother contends that the trial court erred with respect to two procedural matters. Citing our recent decision in the **A.M.H.** case, Mother first asserts that Referee Beeler "did not have the authority to hear and decide" the case as a Special Judge, and that the trial court therefore erred in adopting Referee Beeler's findings and recommendations. This issue presents a question of law. Hence, "we review [it] under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower court[]." **S. Constructors, Inc. v. Loudon County Bd. of Educ.,** 58 S.W.3d 706, 710 (Tenn. 2001).

The Tennessee Code provides the rules and procedures that a trial court must follow when appointing a Special Judge. T.C.A. § 16-15-209 specifically addresses when and how to appoint Special Judges in juvenile court matters. Subsection (a)(1) of § 16-15-209 provides that a judge of a court of general sessions or juvenile court that finds it *necessary* to be absent from court shall first attempt to locate a judge to serve by interchange. If a judge cannot serve by interchange, the absent judge shall request that a current, former, or retired judge sit, by mutual agreement, as Special Judge. T.C.A. § 16-15-209(a)(1),(2). If necessary, the absent judge may then request assistance from the Administrative Office of the Courts in finding a judge to sit as Special Judge. *Id.* at (a)(3). If the absent judge is unable to secure a Special Judge via the procedures described in subsections (a)(1)-(3), the judge "may appoint a lawyer from a list, on a rotating basis, of lawyers that have been previously approved by the judge or judges of the district or county. . . ." *Id.* at (a)(4). When subsection (a)(4) is evoked and a practicing lawyer stands to sit as Special Judge, the parties and their counsel must be notified of the circumstances and must choose whether to proceed with the lawyer sitting as Special Judge or to wait for the return of the regular judge. *Id.* at (a)(4)(A),(B).

Subsections (a) through (e) of T.C.A. § 17-2-118 (Supp. 2006) more generally provide the rules and procedures to be followed where there is "good cause" to permit a judge of a state or county trial court of record to appoint a substitute judge. Those subsections provide the following:

> (a) If, for good cause, including, but not limited to, by reason of illness, physical incapacitation, vacation or absence from the city or judicial district on a matter related to the judge's judicial office, the judge of a state or county trial court of record is unable to hold court, such judge shall appoint a substitute judge to hold court, preside and adjudicate.

> (b) A substitute judge shall possess all of the qualifications of a judge of the court in which the substitute is appointed.

> (c) No substitute judge may be appointed for a period of more than three (3) days; provided, that any such judge appointed pursuant to

this section may finish any trial that is commenced during the period of appointment.

(d) A substitute judge appointed pursuant to this section shall have no authority to award fees except those that are statutory.

(e) A substitute judge shall not preside over a cause without a consent form signed by all litigants who are present at the beginning of the proceeding. Such consent form shall plainly state that the substitute judge has not been duly elected by the citizens of the judicial district or appointed by the governor but has been appointed pursuant to this section. Further, the consent form shall include the name of the lawyer appointed as substitute judge, the judge of the court in which such substitute judge is sitting, the date for which the substitute judge was appointed, and the reason for the regular judge's absence. The consent form shall be transmitted and maintained on file for public inspection at the administrative office of the court in Nashville.

(Footnote omitted). Subsection (f) of § 17-2-118 then goes on to state that the rules and procedures outlined by subsections (a) through (e) "shall not apply where a judge finds it *necessary* to be absent from holding court," and appoints either one of the following individuals as a substitute judge:

(1) A duly elected or appointed judge of any inferior court; or

(2) A full-time officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, *such as a juvenile referee*, a child support referee or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. Such judicial officer shall only serve as special judge in matters related to that officer's duties as a judicial officer.

(Emphasis added).

The foregoing statutes and our analysis in the *A.M.H.* case support Mother's assertion that Referee Beeler lacked the authority to preside as Special Judge. In *A.M.H.*, we cited the requirements of §§ 16-15-209 and 17-2-118 and found that the trial court had failed to follow the proper procedure for appointing a Special Judge. 198 S.W.3d at 762-64. The record in the *A.M.H.* case lacked any evidence suggesting that the trial court followed the rules and procedures outlined by those statutes. *Id.* at 764. The same can be said of the record currently before us. As in the *A.M.H.* case, there is "no order appointing [Referee] Beeler as a special judge and no evidence regarding whether the absence of Judge Jones was 'necessary.'" *See id.* In *A.M.H.*, Referee Beeler failed to articulate the basis for his authority as Special Judge. *Id. See In re Valentine*, 79 S.W.3d 539, 545 n.5 (Tenn. 2002) (stating that "special judges should confirm that their authority to preside

-11-

is contained in the record"). Referee Beeler also failed to articulate the basis of his authority in this case.

The fact that Referee Beeler did not have the authority to act as a Special Judge does not end our analysis in the instant case. On March 22, 2006, following our decision in the *A.M.H.* case, but prior to the trial court's entrance of a final judgment in this case, Referee Beeler recanted his previous statement that he would be hearing the case as a Special Judge and announced that he was hearing the case as Juvenile Court Referee. No one disputes the fact that Referee Beeler possesses the status and authority to act as Referee. *See* T.C.A. § 37-1-107.[7] Mother however does dispute whether Referee Beeler's initial error in announcing that he was hearing the case as Special Judge could "be cured by the same individual [*i.e.,* Referee Beeler] merely changing hats and hearing the remainder of the case as [R]eferee."

We find, in the instant case, that Referee Beeler successfully cured the earlier erroneous announcement that he would be hearing the matter as Special Judge. We first note that there is

---

[7]T.C.A. § 37-1-107 provides, in pertinent part, as follows:

> (a) The judge of the juvenile court may appoint one (1) or more suitable persons to act as referees at the pleasure of the judge. A referee shall be a member of the bar and may qualify and shall hold office at the pleasure of the judge. . . .
>
> (b) The judge may direct that any case or class shall be heard in the first instance by the referee in all cases wherein the juvenile court has jurisdiction in the manner provided for the hearing of cases by the court.
>
> (c) A referee has the same authority as the judge to issue any and all process. The referee in the conduct of the proceedings has the powers of a trial judge.
>
> (d) Upon the conclusion of the hearing in each case, the referee shall transmit to the judge all papers relating to the case, together with the referee's findings and recommendations in writing. Any hearing by a referee on any preliminary matter is final and not reviewable by the judge of the juvenile court, except on the court's own motion. . . .
>
> (e) Any party may, within five (5) days thereafter, excluding nonjudicial days, file a request with the court for a hearing by the judge of the juvenile court. The judge may, on the judge's own motion, order a rehearing of any matter heard before a referee, and shall allow a hearing if a request for such hearing is filed as herein prescribed. Unless the judge orders otherwise, the recommendation of the referee shall be the decree of the court pending a rehearing.
>
> (f) In case no hearing before the judge is requested, or when the right to a hearing is waived, the findings and recommendations of the referee become the decree of the court when confirmed by an order of the judge. The final order of the court is, in any event, proof of such confirmation, and also of the fact that the matter was duly referred to the referee. A party may appeal such order pursuant to the provisions of § 37-1-159.

-12-

nothing to suggest that the process followed by Referee Beeler at the August, 2005 hearing – the hearing in which he stated that he was acting as Special Judge – differed in any way from the process that would have been followed had Referee Beeler appropriately stated that he was hearing the case as Juvenile Court Referee. Furthermore, when it mattered, Referee Beeler appropriately conducted the proceeding within his authority as Juvenile Court Referee. For example, when he announced that he was hearing the case as Referee, rather than Special Judge, he stated that any party could therefore appeal his decision to Judge Jones within five days. *See* T.C.A. § 37-1-107(e). Thus, he corrected his previous statement that any appeal of his decision would go directly to the Court of Appeals, as opposed to first going to Judge Jones. Upon the conclusion of the March, 2006 hearing, Referee Beeler transmitted his findings and recommendations to Judge Jones. *See* T.C.A. § 37-1-107(d). Because Mother did not request that Judge Jones rehear the case, and because Judge Jones did not request a rehearing on his own motion, Judge Jones signed the Final Decree of Guardianship which incorporated Referee Beeler's findings and recommendations. *See* T.C.A. § 37-1-107(e), (f). The record therefore supports a finding that Mother was in no way harmed or prejudiced by Referee Beeler's initial statement that he would be hearing the case as a Special Judge.

We also note that, as in the *A.M.H.* case, Mother first raised the issue regarding Referee Beeler's authority to sit as Special Judge on appeal. Mother did not question Referee Beeler's authority at the trial court level. She did not question whether Judge Jones' absence was "necessary" or why her consent to permit Referee Beeler to act as Special Judge had not been sought. *See* T.C.A. §§ 16-15-209(a)(1), (4)(A),(B), 17-2-118(e), (f). It is well-settled that issues not raised at the trial court level may not be raised for the first time on appeal. *A.M.H.*, 198 S.W.3d at 764 (citing *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001)); *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991). Mother is not entitled to relief on this issue.

B.

As a separate issue, Mother contends that the trial court erred in denying her motion to continue the termination hearing until after October 3, 2005, *i.e.*, the date previously scheduled for her criminal trial. She claims that the trial court's refusal to grant the continuance violated her right to mount a meaningful defense because it required her to choose between (1) testifying at the termination hearing and thereby risking the possibility that her testimony would be used against her in the subsequent criminal proceedings, or (2) not testifying (*i.e.*, invoking her Fifth Amendment right against self-incrimination) and thereby risking the possibility of a negative inference being drawn from her failure to testify. This issue is also found adverse to Mother.

With respect to a denial of a motion for continuance, "[a]n appellate court cannot interfere with the trial court's decision unless such decision constitutes an abuse of discretion and causes prejudice to the party seeking the stay or continuance." *Sanjines v. Ortwein & Assocs., P.C.*, 984 S.W.2d 907, 909 (Tenn. 1998) (citation omitted). Under the abuse of discretion standard,

> a trial court's ruling "will be upheld so long as reasonable minds can
> disagree as to [the] propriety of the decision made." *State v. Scott*, 33

S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

A similar argument to the one asserted by Mother was made in the case of *Rachels v. Steele*, 633 S.W.2d 473 (Tenn. Ct. App. 1981). In *Rachels*, the plaintiff brought a civil action against the defendant alleging that the defendant had fraudulently misappropriated funds belonging to the plaintiff. *Id.* at 474. The defendant filed a motion to stay the civil proceeding, stating that

> . . . she is presently a target of a criminal investigation being conducted by the Criminal Investigation Division of the Internal Revenue Service which involves the subject matter of the litigation presently pending before this Court. To require [her] to respond to a motion for a summary judgment or to otherwise answer or plead to the complaint filed in this cause would interfere with [her] exercise of her Fifth Amendment privileges afforded by the Constitution of the United States of America.

*Id.* at 475. The trial court denied the defendant's motion. *Id.*

In the instant case, the defendant appealed, arguing that the trial court had abused its discretion in denying her motion to stay. *Id.* at 474. This Court affirmed the trial court's denial of the defendant's motion, finding as follows:

> The principal thrust of defendant's argument on this issue is to the effect that defendant was faced with both a criminal proceeding and a civil action at the same time; thus the choice given her was either to forfeit her defense to plaintiff's civil action and thus give up her property without a fight, or to testify in defense of plaintiff's action and thereby provide for the government some type of discovery which otherwise would not be normally obtainable in a federal criminal action. In other words, defendant takes the position that without a stay of this action she was facing compulsory self-incrimination.
>
> In our opinion, the cases do not support her contention. . . .In *Arthurs* [v. Stern, 560 F.2d 477 (1st Cir. 1977)], a physician was accused of

-14-

writing illegal prescriptions. Disciplinary proceedings were begun before the Board of Registration and Discipline, and at the same time a criminal investigation was also begun, resulting in indictments being handed down. The plaintiff requested that the disciplinary hearing be continued until after the disposition of the criminal charges, which request was refused. The plaintiff then brought a suit in the U.S. District Court, pointing out that the disciplinary board would infer from his silence that he was guilty, if he invoked his privilege against self-incrimination at the hearing. On the other hand, he argued that the threat of losing his license would force him to testify; thus revealing information that might be used against him in the criminal trial. Citing his Fifth Amendment privileges against self-incrimination, the district court enjoined the disciplinary board from refusing the doctor a continuance.

On appeal, the First Circuit Court of Appeals found that it was not constitutionally impermissible in a civil case for the trial court to draw an adverse inference if one refuses to testify. Citing the case of *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the court in *Arthurs* stated:

> The *Baxter* court stated the principle broadly; The Fifth Amendment does not bar an adverse inference "where the privilege is claimed by a *party to a civil cause*." 560 F.2d at 478. (emphasis added)

In reversing the district court, the court stated:

> Nor is there anything inherently repugnant to due process in requiring the doctor to choose between giving testimony at the disciplinary hearing, a course that may help the criminal prosecutors, and keeping silent, a course that may lead to the loss of his license. *Id.* at 478-479.

In the case of *U.S. v. White*, [589 F.2d 1283 (5th Cir. 1979)], this principle is approached from a different viewpoint. An aluminum siding company sued several former employees for defrauding the company. This scheme to defraud became the focus of a federal grand jury investigation, indictments were returned, and after a jury trial, two defendants were convicted. On appeal, the defendant Keno contended that being forced to trial in the civil matter, while there were criminal charges arising out of the same conduct pending

against him, forced him to choose between losing the civil suit or preserving his Fifth Amendment privilege. In rejecting this argument, the court said:

> He was not forced to surrender his privilege against self-incrimination in order to prevent a judgment against him; although he may have been denied his most effective defense by remaining silent, there is no indication that invocation of the fifth amendment would have necessarily resulted in an adverse judgment. 589 F.2d at 1286.

In *White*, we are given a clear explanation of the manner of exercise of the privilege herein involved. At page 1287, the court states:

> Once it is recognized that Keno was not compelled to testify, it becomes clear that his decision to do so was a product of trial strategy. Any "waiver" of the fifth amendment must be voluntary, but invocation of the privilege does not release defendant from any choice concerning the use of his or here testimony. The fifth amendment preserves the right to choose, and the voluntariness of the choice is always affected in some way by the exigencies of a particular situation. The voluntariness inquiry necessarily incorporates an understanding that defendant cannot be free from conflicting concerns, and in any case, defendant must weigh[] the relative advantages of silence and explanation. In the present case, the state court did not so unduly burden the employment of silence as to make the decision to testify involuntary.

*Rachels*, 633 S.W.2d at 475-76. Admittedly, the *Rachels* case and the cases cited therein involve different civil proceedings than the one currently before us. To our knowledge, this issue has not been addressed in Tennessee within the termination of parental rights context. However, we find that the reasoning in the *Rachels* case and the cases cited therein translate to the instant matter. Requiring Mother to choose between (1) testifying at the termination hearing and thereby opening herself up to the possibility that her testimony will be used against her in a related criminal matter, or (2) keeping silent and thereby permitting the trial court to draw an adverse inference from her refusal to testify does not "unduly burden the employment of silence as to make the decision to testify involuntary." *Id.* at 476 (citing *White*, 589 F.2d at 1287)).

-16-

Tennessee public policy also supports the constitutionality of the choice imposed on Mother. A paramount consideration in termination of parental rights proceedings is, of course, the best interest and welfare of the child. *See* T.C.A. § 36-1-113(c)(2); *see also* T.C.A. § 36-1-101(d) (2005) ("In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, . . ."). A prompt and expedited conclusion to termination proceedings is essential to the child's welfare. *See* T.C.A. § 36-1-113(k) (stating that the court shall ensure that the termination hearing takes place within six months of the date that the petition to terminate is filed, "unless the court determines an extension is in the best interests of the child."); T.C.A. § 36-1-124 (2005) (providing that contested termination and adoption proceedings shall be expedited at trial and on appeal). The child in the instant case was placed into State custody shortly after her birth. DCS filed its petition to terminate the parental rights of Mother and Father approximately 11 months thereafter. The termination hearing was continued on at least one occasion. The hearing began approximately nine months after DCS filed its petition. Given the policy consideration that calls for a prompt conclusion to termination proceedings, and the determination that the choice to testify or not to testify in this situation is constitutionally permissible, we cannot say that the trial court abused its discretion in denying Mother's request for a continuance.

III.

Mother does not challenge the trial court's findings with respect to the existence of grounds for termination or that termination is in the best interest of the child. Suffice it to say, there is overwhelming evidence to support the trial court's findings on these issues.

IV.

The judgment of the trial court is affirmed and this matter is remanded to the trial court for enforcement of its judgment and collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed against the appellant, F.R.G.

_____
CHARLES D. SUSANO, JR., JUDGE