IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2013

IN RE ALLISON N.A. ET AL.

Appeal from the Juvenile Court for Rhea County
No. 45-4607     James W. McKenzie, Judge

No. E2011-02362-COA-R3-PT-FILED-SEPTEMBER 5, 2013

This is a termination of parental rights case regarding Allison N.A., David M.B., and Raven H.B. ("the Children"), the minor children of Rebecca A.B. ("Mother") and Jerry W.E.B. ("Father"). Mother and Father are divorced and reside in different states. Mother and the Children resided in Tennessee in a home with Mother's then-boyfriend, Troy R. ("Boyfriend"). The Department of Children's Services ("DCS") removed the Children, then ages eight, four and three, respectively, from Mother's care after Boyfriend was arrested for a physical assault against the youngest child. Relatives, with whom the Children were first placed, proved not to be able to care for them. DCS obtained custody and the Children entered foster care. Thereafter, they were adjudicated dependent and neglected. Father was located and he was notified of the Children's situation. He did not seek custody. More than a year after the Children were placed in foster care, DCS filed a petition to terminate both parents' rights. After a trial, the court granted the petition based on its finding that multiple grounds for termination exist as to both parents and that termination is in the Children's best interest. Both findings were said to be made by clear and convincing evidence. Mother and Father appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Larry G. Roddy, Dayton, Tennessee, for the appellant, Rebecca A.B.

No appearance by or on behalf of appellant, Jerry W.E.B.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

On February 25, 2011, DCS filed a petition to terminate both parents' rights. At the time of the August 2011 bench trial that followed, Allison was ten, David was six, and Raven was four. The Children were in the same foster home. They had lived there for nearly 18 months.

Mother and Father began dating in middle school while both lived in Geogia. Father failed to attend school as required and was sent to an alternative youth camp. He dropped out of school for good after the ninth grade. He could write "a little bit"; he did not read very well. Mother quit school before she had completed the eighth grade. Mother became pregnant at 15 and moved in with Father and his parents. Mother and Father married in July 2004. Their second child died of asphyxiation at three months old. They moved to Kansas, where they had two more children. They lived there for several years before finally separating. While the family was together, Father worked for a roofing company "from daylight to dark every day" to support them. After their divorce, Father returned to Georgia and Mother, with the Children, came to live in Tennessee. They attempted to resume their relationship and moved in with friends in Georgia for a time, but their efforts in this regard were not successful.

In July 2009, Child Protective Services was summoned to the Children's daycare center after the staff observed injuries to two-year-old Raven. Andrea Sansone, the CPS investigator, reported that Raven had "significant bruising on her buttocks, on her thighs, on her face, on her neck." She had further bruising and scratches on her arms. Ms. Sansone and law enforcement officers went to the home shared by Boyfriend, Mother and the Children. Boyfriend was arrested for assault on the child. Ms. Sansone accompanied Mother to the daycare to retrieve the Children. When they arrived, Mother "burst into the daycare and [announced,] 'Come on kids, Daddy's going to jail and y'all have got to go live with someone else.' "[1] The Children became upset, prompting Ms. Sansone to request that Mother try to make the situation as easy as possible for them. Ms. Sansone accompanied Mother and the Children to the hospital for further examinations. At the hospital, Mother again upset the Children by walking into the waiting room and loudly announcing, "All right,

_____

[1]Mother apparently referred to Boyfriend as "Daddy."

you've got to go live with strangers now." Ms. Sansone noted that Mother gave many different explanations for Raven's injuries. She first claimed she didn't notice the bruises when the Child left the house that morning. She then attributed them to the child playing roughly with pit bull dogs in the home, and then said the child was "clumsy," bumped into walls and fell down a lot. Days later, at the first DCS family and team meeting, Mother admitted that Boyfriend physically disciplined the child and "may have spanked her too hard." Ms. Sansone conceded she found nothing to suggest any history of abuse by Boyfriend nor did he have a prior criminal history. At trial, Mother admitted that, for a long time, she had refused to accept the idea that Boyfriend inflicted the injuries.

The home they shared belonged to Boyfriend. Mother was adamant that she would remain with him. As a result, it was necessary for DCS to find an immediate placement for the Children. According to Ms. Sansone, while she attempted to locate a suitable placement that night, Mother's primary concern was "trying to figure out how to get money to bail [Boyfriend] out." Boyfriend was soon released and returned home to Mother. Ms. Sansone encouraged Mother to move to a shelter so she could stay with the Children, but Mother refused. During interviews with Ms. Sansone, Allison reported that Boyfriend had spanked Raven the night before because she would not go to bed. She added that Boyfriend spanked all the Children and sometimes held them upside as he did so. David agreed that Boyfriend would "whoop their butts."

Mother identified Father as the Children's biological father, but said she had no idea how to contact him. Within a few days, Ms. Sansone located Father's parents in North Georgia and related that it was important that Father contact her regarding the Children. Just after the September 17, 2009, preliminary hearing, Ms. Sansone reached Father at his parents' home and advised him about the Children's situation. Father first told Ms. Sansone he was homeless and unemployed, then said he lived with his parents and was looking for work. Ms. Sansone provided Father with the DCS case manager's contact information and advised him he would need to complete a permanency plan for the Children. Ms. Sansone testified that the paternal grandparents called her often, but Father never initiated any contact with her.

The Children were initially placed with relatives. After a month, the Children were placed in DCS's protective custody when the relatives could no longer care for them. A custodial permanency plan was developed in September 2009 with "return to parent" as its goal. Following a November 2009 adjudicatory hearing, the trial court found the Children to be dependent and neglected. The trial court observed that, at the hearing, Mother "again tried to downplay [Boyfriend's] role in the injuries." The detective who investigated the case testified that Mother finally admitted to him that she saw Boyfriend put marks on the child. He further testified that Boyfriend admitted to "losing it" while spanking Raven. The court

noted Mother's testimony that "she planned to marry [Boyfriend] when her children were returned to her custody."

In December 2009, nearly four months after the Children were removed, Mother and Boyfriend ended their relationship. Mother moved in with the Bradys, friends of Boyfriend. During 2009, Mother twice declined to move into a place DCS had secured at Serenity Pointe, a women's home that offered a place to stay and assistance with permanent housing, employment, counseling and other needs. She also failed to complete her application for public housing. At the end of December 2009, Mother returned to Georgia to live with her grandmother, then moved back and forth between the Bradys' and her grandmother's home in the months that followed. By February 2010, Mother had applied for jobs at three restaurants. In March 2010, Mother rented a trailer home and moved in even though she had no job. She was hired at Taco Bell and dismissed two weeks later, then got a job at a restaurant and lost it after three weeks. By May 2010, Mother had lost her rented trailer, was unemployed, and again lived with Father's parents. In all, Mother worked for a total of seven weeks from the time the Children were removed until November 2010, when she began working weekends at a flea market for a Paulette Bowers. In addition to providing her with part-time work and transportation, Ms. Bowers allowed Mother to move into her home; she did not require Mother to pay rent or utilities. At the time of trial, Mother remained in Georgia, where she lived with her sister in a two-bedroom home. She earned $30 a week babysitting her nephew and received food stamps. She traveled with her new boyfriend, a truck driver, on his weekend road trips.

At the time of trial, Father lived with his parents in Flintstone, Georgia, in a five-bedroom house since late 2009. The lease on their rental house had just expired and became a month-to-month tenancy. They had no other housing option. Father had been employed for the past three months. He offered no evidence to corroborate his claim that child support payments were being deduced from his checks. As to visitation, Father admitted that he had had no contact with the Children since Mother lost custody to DCS in July 2009. Father said he learned of the Children's removal from Mother's sister. He admitting he received a letter informing him that the Children had been taken into DCS custody a year earlier. He acknowledged receipt of a certified letter about the termination proceeding two or three months before trial. Father said he repeatedly called the Rhea County DCS office about the Children's case but no one ever answered or returned his messages. Father testified he never came to Tennessee regarding the Children until the termination hearing was set because he had no means of travel. He conceded that he participated in a DCS child and family team meeting by telephone during which the case manager reviewed the permanency plan with him. Father said he never received anything in the mail and could not remember his responsibilities under the plan. Father did not keep an appointment to meet with Miranda Yarger, the Children's DCS case manager, in person. He said he considered coming to the

DCS office in person about the Children, "but wasn't in a position and . . . didn't have a car and finances to do that." He had asked his parents to take him, but "they said they didn't have any gas."

Father had remodeled the garage into bedrooms for himself and the Children. He worked for a company in Chattanooga packaging DVDs and had almost completed his 90-day trial period with his new employer. Father expected to become a full-time employee and hoped to move up in the company. Father sought custody of the Children or at least visitation. Regarding the permanency plan, Father completed none of the required steps leading up to the time of trial – he had not completed parenting classes, did not visit the Children, did not pay child support, and had not maintained contact with DCS in the months following the Children's removal. Father had another child, an eight-year-old daughter, who resided in Alabama. He had no contact with that child since 2006 and believed that he and the mother had lost rights to her. Father said his attorney contacted him about the present case but they only spoke by telephone. He testified he first requested visitation with the Children, through counsel, roughly two weeks before the trial was set to begin. He said his request was denied, but he did not know or ask the reason. Father said he cried because he had not seen the Children in a long time. Father generally testified that he didn't know how to go about seeing the Children and never asked to attend the court hearings with Mother because he "just assumed I'm not supposed to be there."

Mother testified she had no problem with the foster home in which the Children lived, but wanted them to live with Father, "considering I can't get a job and he's got one," so that she could visit them. She described Father as a "good dad."

The trial court terminated Mother's rights based on its finding of abandonment by failure to establish a suitable home for the Children; failure to comply substantially with the requirements of the Children's permanency plan; and the persistence of the conditions that led to the Children' removal. Father's rights were terminated based on his willful abandonment of the Children and his substantial noncompliance with the permanency plan. Mother and Father filed separate, timely notices of appeal.

II.

Mother frames the issue for our review as follows:

> Did DCS prove, by clear and convincing evidence, grounds for termination of parental rights and was it in the best interest of the Children to terminate parental rights?

As will be discussed later in this opinion, Father did not file a brief or take any action in furtherance of his appeal. We nonetheless consider the termination order as to both parents. We proceed mindful that only a single ground must be clearly and convincingly proven to justify termination. *In re Audrey S*., 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

## III.

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

As this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 at *11-12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011)(citations omitted).

IV.

A.

We begin with Mother. Within a single argument, she essentially challenges the trial court's findings of clear and convincing evidence to support each ground for termination as well as the best interest determination. In summary fashion, Mother asserts:

> The only thing [Mother] is guilty of is making a poor decision relative to picking a mate. It is not alleged that she is a criminal nor drug addict. It has never been alleged that she was not a good mother nor that she did not have a good relationship with her children. When the government removes a child from the home of a parent who stands in the shoes of [Mother] then this court must act in a ma[nner] which is most fundamental in our society. The State of Tennessee and [DCS] have failed to prove, by any stretch of imagination, any of the statutory grounds for termination of parental rights by clear and convincing evidence. The State . . . and [DCS] have failed to prove that it would be in the best interest of the minor children to terminate [Mother's] parental rights.

We consider each ground for termination, in turn.

B.

The trial court found that Mother abandoned the Children by failing to provide them with a suitable home pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1)(2010) and 36-1-102(1)(A)(ii)(2010). "Abandonment" under Section 36-1-102(1)(A)(ii) means that:

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, . . . and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the

-7-

department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

As to Mother, the trial court found as follows:

DCS proved by clear and convincing evidence that [Mother] failed to provide a suitable home for the [C]hildren in the four months after they were removed into foster care. . . . This Court adjudicated the [C]hildren dependent and neglected and placed them in DCS custody. . . . In the four months after the removal, DCS made reasonable efforts to help her establish a suitable home for the [C]hildren. Instead, [Mother] moved from home to home, relying on other people, instead of getting a job and providing a stable home for her family. DCS tried to help her get a home, but [Mother] refused all the help that DCS offered.

The proof at trial showed that for most of the four-month period following the Children's removal to DCS custody, Mother remained with Boyfriend. In our view, the fact that Mother chose to continue living with someone who was at that point the sole impediment to her being reunited with the Children is clear evidence that Mother was more focused on herself than on finding a safe, suitable home for the Children. Mother's relationship with Boyfriend finally ended in December 2009. As the trial court noted, after the breakup, she began moving from place to place, and relying on various relatives and friends for her basic needs. Mother repeatedly failed to take advantage of the space DCS secured for her and the Children at Serenity Pointe where the family could have stayed for up to a year. DCS also encouraged Mother to obtain public housing, but her application was denied because she didn't submit all the required documentation. It was not until mid-March 2010 that Mother managed to rent a trailer for herself. However, she did so while she was unemployed and lost that home after a few months. She continued jumping from place to place before moving into her sister's home in April 2011. Mother remained with her sister at the time of trial, but was not on the lease. She planned to sleep in the living room and give the Children her bedroom if she regained custody. At trial, Mother expressly conceded that she had not yet been able to secure a home with suitable living conditions for the Children. Referring to her $30 weekly income from babysitting, Mother took the position that she had at least found a job.

The evidence does not preponderate against the trial court's finding that Mother abandoned the Children by failing to establish a suitable home for them during the many months following their removal. The trial court did not err in relying on Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii) to terminate her rights.

C.

The trial court found that Mother had failed to comply substantially with her responsibilities under the permanency plan, "a written plan that sets out requirements to achieve family reunification or other appropriate goals, such as adoption or permanent foster care." *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 765 (Tenn. 2006). In *A.M.H.*, the Supreme Court observed:

> Pursuant to T.C.A. § 36-1-113(g)(2), parental rights may be terminated upon proof by clear and convincing evidence that "there has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care…." The requirements must be stated in specific terms and must be reasonably related to the specified goal. Substantial compliance with the statement of responsibilities in a child's permanency plan is essential. However, substantial noncompliance will not be found based on minor, trivial, or technical deviations from a permanency plan.

*Id*.

In the present case, a custodial permanency plan was established in September 2009. The plan tasked Mother with completing certain steps by March 22, 2010. These included completing parenting classes, taking medications as prescribed, attending individual counseling, securing stable housing and employment, and maintaining contact with DCS. Mother admitted that, at the outset, her case manager advised her that it would be very difficult to regain custody as long as she remained with Boyfriend. The plan, as revised in May 2010, credited Mother with attending parenting classes but noted she had made little other progress. The plan required her to undergo a court-ordered parenting assessment. Otherwise, the requirements were unchanged. The trial court expressly found the plan was "reasonably related to the reasons for the [C]hildren's placement in foster care." This finding is not in dispute.

The proof showed that at the time of trial, Mother had made limited progress in some areas of concern: she completed parenting classes, attended some counseling sessions, and

had ended her relationship with Boyfriend, albeit several months after the Children's removal as a result of his actions. By 2011, she had completed a parenting assessment. In addition, up until the termination petition was filed, Mother regularly visited the Children. In some of the most significant areas, however, Mother failed to meet her responsibilities. In particular, the trial court found that Mother "never got a stable home or a job." Mother testified she had applied for 11 jobs – at fast food restaurants and convenience stores – since the Children were removed. At trial, she seemed resigned to remaining with her sister and pursuing disability benefits. Mother said she attended some anger management sessions, as recommended by CPS, but had not yet completed the course or provided proof of attendance to DCS. She said she attended counseling when she lived in Tennessee and started again after she moved back to Georgia. In the initial permanency plan, DCS noted Mother was in counseling during 2009 for "depression, grief, anxiety, domestic violence issues and concerns regarding a failure to protect." The revised plan reflected that she needed continued counseling, but quit without being successfully discharged.

There was clear and convincing evidence at trial to support the trial court's finding that Mother was in substantial noncompliance with her responsibilities under the permanency plan. Most significantly, Mother failed to make any discernable progress toward obtaining stable housing and employment. The evidence does not preponderate against the trial court's termination of parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

D.

The trial court found that termination of Mother's rights was warranted pursuant to Tenn. Code Ann. § 36-1-113(g)(3). That section provides for termination when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

In support of its finding of persistence of conditions, the trial court stated:

> DCS proved by clear and convincing evidence that conditions persist that make it impossible to return the [C]hildren to [Mother's] home. . . . The [C]hildren have been removed from her home more than six months. . . . The conditions that led to the removal persist – she has not taken the responsibility to make a home for these children. [Mother] has no way to provide for the [C]hildren – she cannot hold down a job. She has not addressed the possible mental or emotional problems that have continued to lead her to make bad decisions – for herself and for her children. Those problems have lasted such a long period of time that there is little likelihood that they will be remedied at an early date.

The trial court accurately summarized and considered the relevant proof as to this ground. The biggest, most pressing challenges Mother faced in seeking to regain custody of the Children were obtaining safe, suitable housing and employment. Mother rejected DCS's efforts to provide her with assistance in both of these areas when she declined to live at Serenity Pointe. There, she could have received the type of support that would potentially have enabled her to take care of herself and the Children. Instead, from the time she lost custody, Mother moved from place to place, lived with various persons, and lost one short-lived job after another. Mother essentially relied on the kindness of others for food, shelter, and her basic needs. Nothing in the proof suggested that Mother's plans or prospects would have allowed her to remedy these conditions, among others, in the near future. The evidence does not preponderate against the trial court's finding of persistence of conditions "that make it impossible to return the [C]hildren to [Mother's] home."

V.

As we have noted, the trial court also terminated Father's parental rights. Appointed counsel filed a notice of appeal on his behalf on November 15, 2011. Thereafter, his trial counsel was permitted to withdraw based on his motion citing Father's lack of communication concerning the case. A second attorney was appointed on July 2, 2012. Correspondence in the appellate court file reflects that the juvenile court clerk contacted Father that same day with counsel's contact information. In September 2012, this Court

granted counsel's motion to withdraw based on his numerous, unsuccessful attempts to contact Father. Thereafter, this Court directed that Father proceed pro se on appeal. Father did not file a brief or take any other action in furtherance of his appeal.

Father's failure to file a brief notwithstanding, we have reviewed each ground for termination in light of the evidence presented at trial. We are led to conclude that the evidence clearly and convincingly establishes that Father (1) abandoned the Children by willfully failing to visit them, *see* Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i), -102(1)(C), -102(1)(E)[2], and (2) failed to comply substantially with his responsibilities as set out in the permanency plan, *see* Tenn. Code Ann. § 36-1-113(g)(2). Accordingly, the trial court properly relied upon these grounds to terminate Father's rights.

## VI.

With respect to the best interest of the child, this Court has observed:

---

[2]Tenn. Code Ann. 36-1-102 provides, in relevant part:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit . . . the child;

> \* \* \*

> (C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

> \* \* \*

> (E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

-12-

When at least one ground for termination of parental rights has been established, as here, DCS must then prove, by clear and convincing evidence, that termination of the parent's rights is in a child's best interest. When a parent has been found to be unfit by establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest.

*In re Eila L.G*, No. E2012-00922-COA-R3-PT, 2013 WL 20884 at * 3 (Tenn. Ct. App. E.S., filed Jan. 2, 2013)(internal citations omitted).

Having concluded in the present case that the trial court properly determined that grounds for termination exist as to both parents, we turn to the trial court's analysis of the Children's best interest. Our review is guided by the non-exclusive list of factors set forth in Tenn. Code Ann. § 36-1-113(i).[3]

---

[3]The factors are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home

(continued...)

In support of its determination that the Children's interest was best served by terminating both parents' rights, the trial court stated, in relevant part:

> DCS proved by clear and convincing evidence that it is in the [C]hildren's best interests that [Mother's] and [Father's] parental rights be terminated pursuant to T.C.A. § 36-1-113(i). Neither one has made an adjustment of their circumstances or homes for the [C]hildren to be safe in the home of either parent.

The proof showed that the Children were removed from Mother's care in the first place solely as a result of injuries inflicted on the youngest child by Boyfriend. From the beginning, Mother failed to act in the Children's best interest when she chose to defend and stay with Boyfriend rather than taking action to protect the Children. Her decision caused Mother to lose precious time that could have been spent pursuing suitable housing, employment and improved mental and emotional health. Progress in these areas could have provided her with the ability to care for the Children on her own.

Instead, by the time trial began, Mother had made little progress. She had not yet paid any child support, but said she planned to make her first payment soon. She testified she had stable housing in her sister's two-bedroom home, but planned to obtain a bigger apartment through public housing. She had not pursued this yet because she didn't know where the Section 8 office was located. On questioning by the court regarding her lack of housing, Mother replied, "Or y'all can just give them to [Father]." She added, "Considering he's got the job and he's got a big enough place for the kids I would rather for him to have them." Mother said she had had five job interviews without success. At first, she testified that she could not support the Children without her sister's help. She then promptly changed

<hr>

³(...continued)

> is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

her position and concluded she could support them considering that her current boyfriend was giving her $140 a week to help pay bills. In addition to shelter, Mother also relied on her sister, who claimed her as a dependent, to receive food stamps. Mother told the court she loved going on the road with her boyfriend on the weekends, but denied that she was more concerned with her relationships than the Children. In the end, the evidence clearly showed, and Mother conceded, that Mother was in no position to have custody of the Children.

As for Father, the proof showed that he became aware of the Children's plight shortly after they were placed in DCS custody. He participated in a telephone conference call in which his case manager reviewed with him the permanency plan, related requirements, and criteria for termination. Father had virtually no contact with his case manager until the termination hearing was looming. Father had made almost no progress on his responsibilities under the plan. Despite being informed that the Children were placed in foster care, Father made no effort to visit, much less seek custody of them. As we have noted, Father squandered the opportunity to work with counsel on appeal when he failed to cooperate and communicate with the attorneys appointed to him. In our view, Father's failure to pursue his appeal is simply another indication of his failure to act with the Children in mind.

The proof further shows that the Children had remained together in their foster home and were doing well. Any medical issues and behavior problems had been addressed. The oldest two children demonstrated continued improvements in their performance at school.

In summary, the evidence showed that neither parent had adjusted their circumstances or conditions so as to allow the court to consider either of them as an appropriate custodian of the Children. Both Mother and Father were seemingly content to allow someone else to care for the Children. On our review of the entire record, the evidence does not preponderate against the trial court's finding that there is clear and convincing evidence to show that termination is in the best interest of the Children.

VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, Rebecca A.B. and Jerry W.E.B. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE