

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 2, 2017 Session

# IN RE MARTERRIO H.[1]

**Appeal from the Juvenile Court for Shelby County**
**No. Z2243      David S. Walker, Special Judge**

_____

## No. W2016-01273-COA-R3-PT

_____

The trial court terminated Mother's parental rights after finding by clear and convincing evidence that (1) Mother failed to substantially comply with the requirements of the permanency plans, (2) Mother's mental incompetence prevented her from properly caring for the Child, and (3) the conditions which precipitated removal of the Child from Mother's custody still persisted. The trial court then found by clear and convincing evidence that it was in the child's best interest to terminate Mother's parental rights. Mother appealed. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and KENNY W. ARMSTRONG, JJ., joined.

Reginald E. Shelton, Memphis, Tennessee, for the appellant, Brenda K.A.

Herbert H. Slatery III., Attorney General and Reporter and Brian A. Pierce, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

James Franklin, Jr., Memphis, Tennessee, Guardian Ad Litem.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

In this matter, the Tennessee Department of Children's Services ("the Department" or "DCS") seeks to terminate the parental rights of Brenda K.A. ("Mother")

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

to Marterrio H. ("the Child").[2]  DCS became involved with the family on August 14, 2012 when the Child and his older brother, Micheal H., were removed from the home because Mother was incarcerated for educational neglect due to her failure to comply with the Compulsory School Attendance Law.[3]  The Child reportedly missed more than one hundred days of school while in Mother's custody.  Shortly after removal, DCS placed the Child in the resource home of Yvonne T., and he has remained there continuously since the removal.  On November 7, 2013, the juvenile court adjudicated the Child dependent and neglected due to educational neglect.  The court found that Mother suffered from mental health issues that prevented her from properly caring for the Child.  The court then ordered that the Child remain in the legal custody of DCS.

Following the removal, DCS developed five permanency plans for the Child between 2012 and 2015.  The initial permanency plan, developed on August 28, 2012, and ratified on October 11, 2012, listed a dual goal of "Return to Parent" or "Exit Custody with Relative."  The second permanency plan, developed on July 17, 2013, and ratified on August 8, 2013, included the same goals as the previous plan.  In the third permanency plan, developed on July 8, 2014, and ratified on August 27, 2014, DCS amended the permanency plan goals to "Return to Parent" and "Adoption."  The permanency plan developed on November 10, 2014, and ratified on January 28, 2015, as well as the final permanency plan developed on June 25, 2015, and ratified on August 26, 2015, listed the same goals as the third permanency plan.  The permanency plans required Mother to (1) complete a parenting assessment and follow all recommendations; (2) complete a mental health assessment and follow all recommendations; (3) pay her $1,400 utility bill; (4) complete a psychological evaluation and comply with recommendations; (5) obtain stable housing; (6) comply with case management recommendations; (7) pay child support; and (8) visit the Child.

DCS assigned Rita Dortch as the case manager in August 2012.  At trial, Ms. Dortch testified that the most important tasks in the permanency plans were for Mother to provide a stable home for the Child and pay her utility bill.  According to Ms. Dortch, DCS assisted Mother in complying with the permanency plans' requirements by transporting her to appointments, providing bus passes, and referring her for counseling and case management services.  DCS worked with Mother for three years before filing the petition to terminate Mother's parental rights.  In the nearly four years between the Child's removal and trial, Mother completed the psychological evaluation, obtained employment two weeks before trial, occasionally purchased food or clothing for the Child, and regularly visited the Child.

---

[2] The trial court also terminated the parental rights of the Child's father, Micheal H.  He is not involved in this appeal.

[3] Micheal H. is now over the age of eighteen and is not a subject of this appeal.

Ms. Dortch testified that DCS arranged for two service providers to provide Mother in-home therapy. The first of these service providers was Camelot, with which Mother complied. As additional assistance, DCS arranged for Health Connect America to provide Mother in-home therapy. However, Mother refused the Health Connect America services.

At the time of trial, Mother had failed to secure stable housing. She resided at her mother's house with her mother and brother. Ms. Dortch testified that this residence initially failed to meet the requirements of the permanency plans because Mother's daughter, who had been charged with severe child abuse, resided in the home.[4] Ms. Dortch further testified that the home failed to meet the requirements of the permanency plans because Mother's brother resided in the home. Ms. Dortch stated that she felt uncomfortable and "kind of afraid" during a visit to the home because she observed the brother talking to himself and laughing. According to Ms. Dortch, Mother informed her that the brother had been diagnosed with schizophrenia and "he doesn't take his medicine." Ms. Dortch testified that she had worked for DCS for thirty years, and she had never asked that a child be returned to a parent who resided with someone diagnosed with schizophrenia unless the person was taking his or her medicine. However, Ms. Dortch admitted on cross-examination that she had not conducted an independent investigation of the brother's mental health.

On July 31, 2014, LaShaunda P. Massey, Ph.D., performed a psychological evaluation on Mother. At trial, Dr. Massey was certified as an expert in clinical psychology. Dr. Massey completed the Minnesota Multiphasic Personality Inventory ("MMPI") test as part of her evaluation of Mother. Dr. Massey explained that the MMPI is "a personality assessment that can give information about the person's clinical disorders and other personality traits that are relevant for some one and that can give indications of their function over time." According to Dr. Massey, the test showed:

> [Mother] is somewhat narcissistic and self-indulgent. That she can have a grandiose conception of her own capabilities. There [were] indications that she can be aggressive at times and has a tendency to blame others for situations and problems not seeing her own role in situations. . . . The testing also suggested that these problems and functioning were pretty long standing.

In Dr. Massey's opinion, the major concerns were Mother's inability to admit her own role in problems and her tendency to blame others for her problems. Dr. Massey diagnosed Mother with Personality Disorder, not otherwise specified. Dr. Massey concluded that this was a long-term diagnosis and it would be difficult for Mother to effectuate change.

---

[4] As of the time of trial, the daughter no longer lived in the home.

At trial, Mother testified about events necessitating the Child's removal from the home. When asked why the Child missed more than one hundred days of school, Mother refused to acknowledge her role in his truancy and blamed the school. Mother testified as follows:

Q. So, whose fault was it?

A. It wasn't mines.

Q. It wasn't your fault?

A. Because if the parents allowed to have the children grades, I was denied that. That is discrimination. It's against the law.

Q. So, they never sent a report card to your house?

A. I'm talking about to - - they brought it home but it wasn't the right - - they had - - their grades wasn't right. I couldn't talk to no one at the school.

Q. So, you did get a report card, but the report card was wrong. Is that what you are saying?

A. Everything was wrong at school.

Mother also testified regarding her efforts to comply with the requirements of the permanency plans. She stated that she had not paid her $1,400 utility bill because she had been unemployed since 2014. However, she further testified that she obtained employment two weeks prior to the trial and planned to pay $200 every two weeks until the bill was paid in full. Mother stated that she had been attending counseling services provided by case management "for a couple of weeks." When asked what case management diagnosed her with, Mother responded, "Mental health."

The Child's foster mother, Yvonne T. ("Foster Mother"), testified to the progress the Child had made while in her home. She stated that he was still two years behind, but his grades were good. Foster Mother explained that the Child had an Individualized Education Plan ("IEP") because he was "kind of behind other kids." As a result, she meets with his teachers to determine the Child's weaknesses and what work is necessary "to get him where he need[s] to be." Foster Mother further testified that she assisted the Child with his homework. According to the foster mother, she and her husband wished to adopt the Child if he becomes available for adoption.

The Child testified at trial that he wanted to be adopted by his foster parents because it was "the best place." He articulated that he understood adoption meant that his birth parents would no longer be his parents and his foster parents would become his parents. When asked how that made him feel, the Child responded, "I'm good."

The trial court heard the case on April 19, 2016 with David S. Walker presiding as a special judge. On May 24, 2016, the trial court entered a final order terminating Mother's parental rights to the Child. The trial court found by clear and convincing evidence that Mother failed to substantially comply with the requirements of the permanency plans, Mother was unable to adequately care for the Child due to her mental incompetence, and that the conditions which precipitated removal still persisted and other conditions existed which would likely subject the child to further abuse and neglect. The trial court also found by clear and convincing evidence that it was in the best interest of the Child to terminate Mother's parental rights. Mother appealed.

On appeal, Mother presents three issues for our review. First, Mother argues that the findings of Special Judge David S. Walker should be set aside for lack of subject matter jurisdiction because he was not appointed as a special judge in accordance with statutory requirements and case law. Second, Mother argues that the trial court erred by finding by clear and convincing evidence that grounds for the termination of Mother's parental rights existed. Finally, Mother argues that the trial court erred by finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). This right is not absolute, however. If a compelling state interest exists, the state may interfere with parental rights. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Nate v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Our legislature has enumerated the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). A parent's rights may be terminated only where a statutory ground exists. *In re Matter of M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Because terminating a parent's fundamental parental rights has severe consequences, termination cases require a court to apply a higher standard of proof. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006). First, a court must determine by clear and convincing evidence that at least one of the statutory grounds for termination exists. Tenn. Code Ann. § 36-1-113(c); *State Dept. of Children's Servs. v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *9 (Tenn. Ct.

App. May 30, 2002). After a court makes this determination, a court must find by clear and convincing evidence that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *Whaley*, 2002 WL 1116430 at *9; *see also In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted)).

Because of the heightened standard of proof required in termination cases, we must adapt the customary standard of review established by Tenn. R. App. P. 13(d). *Id.* In accordance with Tenn. R. App. P. 13(d), we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. *Id.* Next, we must determine whether the facts establish the existence of one or more grounds for termination by clear and convincing evidence. *In re M.J.B.*, 140 S.W.3d at 654.

ANALYSIS

Special Judge

We begin with Mother's argument that the trial court lacked subject matter jurisdiction because David S. Walker was improperly appointed to preside over the termination proceedings as a special judge. Subject matter jurisdiction refers to a court's authority to adjudicate a particular case or controversy. *Freeman v. CSX Transp., Inc.*, 359 S.W.3d 171, 176 (Tenn. Ct. App. 2010). If a court adjudicates a case without subject matter jurisdiction, its judgments or orders are void. *Riden v. Snider*, 832 S.W.2d 341, 343 (Tenn. Ct. App. 1991). Subject matter jurisdiction is so fundamental it can be raised at any time. *Freeman*, 359 S.W.3d at 176. Therefore, subject matter jurisdiction may be considered on appeal even if not raised in the trial court. *Id.*

The trial court's final judgment, signed by Mr. Walker, states in pertinent part:

The Judge of the Juvenile Court of Memphis and Shelby County, Tennessee finds it necessary to be absent from holding Court, and pursuant to Tennessee Code Annotated § 17-2-122(b) appoints a substitute Special Judge, David S. Walker, who is a licensed attorney in good standing with the Tennessee Supreme Court and a Magistrate appointed by him to serve as the Special Judge in matters related to duties as a judicial officer. *No party objected to the Special Judge presiding over this matter.*[5]

---

[5] Tennessee Code Annotated § 17-2-122 provides:

(Emphasis added.) Tennessee Code Annotated section 16-15-209 specifically addresses the procedure a juvenile court should follow when appointing a special judge. If a judge finds it necessary to be absent from court, he or she shall first attempt to find a judge to serve by interchange or locate a former or retired judge to sit as special judge. Tenn. Code Ann. § 16-15-209(a)(1). If necessary, the judge may request assistance from the Administrative Office of the Courts in locating a judge to sit as special judge. Tenn. Code Ann. § 16-15-209(a)(2). "Only after exhausting the procedure set out in subdivisions (a)(1) and (2), a judge may appoint a lawyer from a list, on a rotating basis, of lawyers that have been previously approved by the judge or judges of the district or county who are constitutionally qualified, in good standing, and possess sufficient experience and expertise." Tenn. Code Ann. § 16-15-209(a)(3). When a lawyer sits as a special judge, the parties and counsel must be notified of the regular judge's absence and that the lawyer is sitting as a special judge. Tenn. Code Ann. § 16-15-209(3)(A). The parties then must choose to proceed rather than continue the case and await the return of the regular judge. Tenn. Code Ann. § 16-15-209(3)(B).

Tennessee Code Annotated section 17-2-118 provides the procedure a judge should follow when good cause exists to permit the appointment of a substitute judge. Those subsections provide as follows:

> (a) If, for good cause, including, but not limited to, by reason of illness, physical incapacitation, vacation or absence from the city or judicial district on a matter related to the judge's judicial office, the judge of a state or county trial court of record is unable to hold court, the judge shall appoint a substitute judge to hold court, preside and adjudicate.
> (b) A substitute judge shall possess all of the qualifications of a judge of the court in which the substitute is appointed.
> (c) No substitute judge may be appointed for a period of more than three (3) days; provided, that the judge appointed pursuant to this section may finish any trial that is commenced during the period of appointment.

---

(a) Notwithstanding § 16-15-209 or § 17-2-109 or any other relevant provision to the contrary, a judge shall have the authority to appoint a special judge as provided in this section.

(b) Sections 16-15-209 and 17-2-109 and any other relevant provision shall not apply where a judge finds it necessary to be absent from holding court and appoints as a substitute judge an officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile magistrate, a child support magistrate or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. The judicial officer shall only serve as special judge in matters related to their duties as judicial officer.

(d) A substitute judge appointed pursuant to this section shall have no authority to award fees except those that are statutory.

(e) A substitute judge shall not preside over a cause without a consent form signed by all litigants who are present at the beginning of the proceeding. The consent form shall plainly state that the substitute judge has not been duly elected by the citizens of the judicial district or appointed by the governor but has been appointed pursuant to this section. Further, the consent form shall include the name of the lawyer appointed as substitute judge, the judge of the court in which the substitute judge is sitting, the date for which the substitute judge was appointed and the reason for the regular judge's absence. The consent form shall be transmitted and maintained on file for public inspection at the administrative office of the courts in Nashville.

Tenn. Code Ann. § 17-2-118(a)-(e). The statutory requirements listed above do not apply, however, "where a judge finds it necessary to be absent from holding court" and appoints one of the following as a substitute judge:

(A) A duly elected or appointed judge of any inferior court; or

(B) A full-time officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile magistrate, a child support magistrate or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. The judicial officer shall only serve as special judge in matters related to that officer's duties as a judicial officer.

Tenn. Code Ann. § 17-2-118(f).

The foregoing statutes support Mother's assertion that Mr. Walker was improperly appointed as a special judge in this case. The record contains no order signed by the trial judge appointing Mr. Walker as a special judge in this matter.[6] Furthermore, the record contains no evidence regarding whether the absence of the trial judge was "necessary."[7] Consequently, the trial court did not follow the proper procedure for appointing Mr. Walker as a special judge in this matter. Whether a special judge has been properly appointed in juvenile court is an issue that has been extensively litigated. These cases, however, have not considered the improper appointment of a special judge in juvenile court as constituting an issue of subject matter jurisdiction. *See generally In re Valentine*,

---

[6] "[S]pecial judges should confirm that their authority to preside is contained in the record." *In re Valentine*, 79 S.W.3d at 545 n.5.

[7] "A judge may not use mere convenience as a basis for being 'absent from holding court.'" *Ferrell v. Cigna Prop. & Cas. Ins. Co.*, 33 S.W.3d 731, 737 (Tenn. 2000) (quoting Tenn. Code Ann. § 17-2-122(b)).

79 S.W.3d at 545 (holding that the mother waived argument regarding the special judge's "general authority" to hear the case because she failed to raise the issue in the trial court); *State Dep't of Children's Servs. v. F.R.G.*, No. E2006-01614-COA-R3-PT, 2007 WL 494996, at *6 (Tenn. Ct. App. Feb. 16, 2007) (stating that Mother waived her challenge to the authority of the special judge, who was improperly appointed, because she failed to raise the issue in the trial court); *see also Ferrell*, 33 S.W.3d at 736-39 (detailing the proper procedure for appointing a special judge).

We considered an argument similar to Mother's in *State Department of Children's Services v. A.M.H.*, 198 S.W.3d 757 (Tenn. Ct. App. 2006). In *A.M.H.*, a special judge presided over a trial in juvenile court, but the record contained no appointment order and no evidence pertaining to whether it was necessary for the trial judge to be absent. *A.M.H.*, 198 S.W.3d at 764. The mother in that case challenged the "general authority" of the special judge arguing the issue concerned the subject matter jurisdiction of the court and could be raised on appeal despite her failure to raise this issue in the trial court. *Id.* at 762. The *A.M.H.* Court held that Mother waived her challenge to the special judge's authority because she failed to raise the issue in the trial court, which signified the court's rejection of Mother's argument that subject matter jurisdiction of the trial court was at issue. *Id.* at 764; s*ee also In re Valentine*, 79 S.W.3d at 545.

In this case, Mother raised no objection, prior to or during trial, to Mr. Walker presiding as a special judge.[8] Accordingly, we conclude that Mother waived her argument challenging Mr. Walker's authority to preside over the termination proceedings as a special judge.

We note, however, that the procedural irregularity in the special judge's appointment would not necessarily demand reversal. If a special judge acts under color of right, "'with a good faith belief in his right to exercise such authority,'" he or she serves as a de facto judge. *Ferrell*, 33 S.W.3d at 739 (quoting *State ex rel Newsom v. Biggers*, 911 S.W.2d 715, 718 (Tenn. 1995)). Moreover, a de facto judge's acts are binding "'as to all parties except the state[.]'" *Id.* (quoting *Biggers*, 911 S.W.2d at 718). The record contains no evidence that Mr. Walker acted other than in the good faith belief of his right to act as a special judge in this case. Accordingly, we conclude that Mr. Walker served as a de facto judge and the parties are bound by his acts.[9]

---

[8] Prior to trial, Mother appeared before the trial court on December 3, 2015 and April 7, 2016. Mr. Walker sat as Special Judge during those appearances, and Mother raised no objection to his authority at those hearings.

[9] This Court has found Mr. Walker acted as a de facto judge in at least two other cases. *See In re Scott H.*, No. W2016-00070-COA-R3-PT, 2016 WL 5667511, at *7 (Tenn. Ct. App. Sept. 30, 2016); *In re I.E.A.*, No. W2016-00304-COA-R3-PT, 2016 WL 3997421, at *10 (Tenn. Ct. App. July 20, 2016). If a practice used to appoint a special judge has been previously deemed irregular, the special judge cannot

- 9 -

The trial court terminated Mother's parental rights on three grounds: (1) substantial noncompliance with the permanency plans; (2) mental incompetence preventing her from properly caring for the Child; and (3) the conditions that caused the Child's removal still persisted. The termination of her parental rights will be supported by the existence of any one of these statutory grounds. *In re Valentine*, 79 S.W.3d at 546.

A. Substantial Noncompliance

Mother first argues that the trial court erred by finding that DCS proved by clear and convincing evidence that she was not in substantial compliance with the permanency plans. Tennessee Code Annotated section 36-1-113(g)(2) provides for the termination of parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" Substantial noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. Whether a parent is substantially noncompliant with a permanency plan is a question of law. *Id.* We review questions of law de novo without a presumption of correctness. *Id.*

In its final judgment, the trial court made the following findings of fact regarding Mother's substantial noncompliance:

> Pursuant to T.C.A. § 36-1-113(g)(2), Respondents [Mother] and [Father] have failed to substantially comply with the obligations and responsibilities outlined in the permanency plans, though the obligations and responsibilities were ratified by the Court as reasonable and related to the reasons necessitating foster care. Family Services Worker Rita Dortch testified as to the creation, goal, and requirements of the permanency plans dated August 8, 2012; July 17, 2013; July 8, 2014; November 10, 2014; and May 20, 2015. The permanency plans require [Mother] to pay child support; visit; complete a parenting assessment and follow the recommendations; complete a mental health assessment and follow all recommendations; pay her Memphis Light Gas and Water ("MLGW") bill in full; complete a psychological evaluation and comply with

satisfy the good faith belief requirement. *State ex rel. Young v. Fish*, No. M2005-02671-COA-R3-CV, 2007 WL 1515143, at *6-7 (Tenn. Ct. App. May 23, 2007) (citing *Woods v. City of McMinnville*, No. M2001-00680-WC-R3-CV, 2002 WL 360325, at *3 (Tenn. Workers' Comp. Panel 2002)). Mr. Walker meets the good faith belief requirement in this case because he presided over the termination hearing before we issued the previous opinions finding that the procedure used to appoint him was not in keeping with the statute.

recommendations; obtain and maintain stable housing; and comply with case management recommendations.

The trial court also found:

> [T]hat although [Mother] has very recently obtained employment (as of March 22, 2016 according to her self-report) and plans to find her own home once her MLGW bill is paid in full with the money made from that job, her efforts are "too little, too late." [Mother] reports she owes MLGW $1,400.00 for an outstanding utility bill, and she plans to pay $200.00 every two weeks until that balance is paid. [Mother] anticipates she will have the bill paid in full by May 2016, at which time she plans on securing housing apart from her mother and brother. The Court finds it will take [Mother] longer than this to pay off her MLGW bill so she can find a stable home. The Court finds that [Mother] will likely not have housing by May 2016 based upon the almost four-year history of this case and the lack of progress made by the mother. The Department made reasonable efforts to assist in compliance. Ms. Dortch testified that the Department had [Mother] evaluated at the Exchange Club of Memphis in 2013 and by Dr. Massey in 2013 and 2014. The Department was unable to assist with the MLGW bill because [Mother] did not have employment and could not guarantee she could maintain the payments on her own. In contrast, Ms. Dortch testified that [Mother] has been treated by Case Management, Inc., providers since November 2015. The Department also attempted to place Health Connect America services in [Mother's] home in 2012 and 2013, but she refused those services. In 2015, Camelot provided six months of in-home help to attempt to assist [Mother] in improving her situation.

After a thorough examination of the record, we determine that the evidence preponderates in favor of the trial court's findings of fact. Mother failed to make a single payment on her utility bill since 2013 and failed to obtain adequate housing, both of which Ms. Dortch identified as the most important requirements of the permanency plans. Furthermore, Mother failed for nearly four years to attend case management services as recommended by Dr. Massey and required by the permanency plans. She waited until "a couple of weeks" before trial to begin attending case management services. Finally, Mother refused to accept any responsibility for the Child's truancy, stating the school's records were incorrect. We conclude that the combined weight of these facts establishes by clear and convincing evidence that Mother failed to substantially comply with the requirements of the permanency plans.

B. Mental Incompetence

Mother also argues that the trial court erred by finding that DCS proved by clear and convincing evidence that she was mentally incompetent to properly care for the Child. Tennessee Code Annotated section 36-1-113(g)(8) provides for termination based on the ground of mental incompetence as follows:

> (B)  The court may terminate the parental or guardianship rights of [a parent] if it determines on the basis of clear and convincing evidence that:
> (i)  The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
> (ii)  That termination of parental or guardian rights is in the best interest of the child;
> (C)  In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

In its final judgment terminating Mother's parental rights, the trial court made the following findings of fact regarding Mother's mental incompetence:

> Pursuant to T.C.A. § 36-1-113(g)(8), Respondent [Mother] is incompetent to adequately provide for the further care and supervision of the child because her mental condition is presently so impaired and is so likely to remain so that it is unlikely that [Mother] will be able to assume or resume the care of and responsibility for the child in the near future. LaShaunda P. Massey, clinical psychologist, testified that she maintains a private practice currently and regularly diagnoses clinical disorders in that practice. The Court certified Dr. Massey as an expert witness in clinical psychology for her testimony in this matter. Dr. Massey testified specifically about an evaluation she completed on [Mother] in July 2014, which the Department requested in order to assess her psychological functioning and resulting impact of her functioning on her ability to parent. In that evaluation, Dr. Massey found evidence to support an Axis II diagnosis of Personality Disorder, Not Otherwise Specified, and concluded at that time that [Mother] had a long-standing psychological maladjustment based upon the history provided. During the evaluation, [Mother] presented as somewhat narcissistic and self-indulgent, and Dr. Massey concluded that [Mother] has an inability to make changes in her life and see her role in situations, and

- 12 -

this inability can hinder any substantial progress with permanency goals. Dr. Massey declined to diagnose [Mother] with a specific personality disorder because she met several criteria of several different personality disorders. Dr. Massey acknowledged on cross-examination that [Mother] displayed several features of narcissism, which are (1) self-indulgence (2) difficulty identifying others' needs (3) chronic tardiness (4) disobedience of the law (5) acting according to one's own perspective (6) blaming others and (7) inability to accurately assess situations. Dr. Massey recommended that [Mother] seek treatment through a case management service as well as show an ability to maintain stable housing and income to support her children prior to reunification attempts. The Court finds [Mother's] personality disorder is long-standing, and it has hindered her ability to make changes and take responsibility for [the Child's] removal into foster care. [Mother] testified that she is currently seeking treatment at Case Management, Inc., but when asked what her diagnosis is, [Mother] responded, "mental health." [Mother] was unable to provide specifics about her diagnosis during questioning. [Mother] also denies any fault in [the Child] missing over 100 days of school prior to his removal from her home and blamed the school for either not providing the child's report card or providing incorrect information.

In support of her argument that mental incompetence was not established by clear and convincing evidence, Mother relies on the case *State Department of Children's Services v. Whaley*, 2002 WL 1116430, (Tenn. Ct. App. 2002). In *Whaley*, a psychologist diagnosed the mother with mild mental retardation. *Id.* The trial court terminated the mother's parental rights, based partly on the ground of mental incompetence. *Id.* at *8. We reversed the trial court's decision terminating the mother's rights. Instead, we held that the State failed to prove by clear and convincing evidence that the mother was incompetent to a degree that she was unable to care for her child because the mother lived alone, visited the child, regulated her medications, completed vocational training, obtained employment, managed to get herself to work on time, and managed to move about the community using public transportation. *Id.* at *12-14. Additionally, the mother substantially complied with the goals set forth by the permanency plans despite her disabilities. *Id.* at *8.

The facts in this case are clearly distinguishable from those in *Whaley*. The record established that Mother failed to maintain employment for almost four years and failed to obtain an adequate home for the Child. Furthermore, Mother failed to substantially comply with the goals in the permanency plans addressing the mental health issues that necessitated the Child's removal from her home. Mother was unaware of the specifics of her mental health diagnosis and denied having mental health issues. She refused to accept responsibility for the conditions which caused the Child's removal from her custody. Additionally, the trial court observed Mother's demeanor during her testimony

and concluded that "she has psychological issues present" because Mother "spoke in a monotone voice" and displayed no emotion during her testimony. Therefore, we conclude that DCS has established the requirements of Tenn. Code Ann. § 36-1-113(g)(8) by clear and convincing evidence, and the trial court properly terminated Mother's parental rights on this ground.

### C. Persistence of Conditions

The third statutory ground upon which the trial court terminated Mother's parental rights was that the conditions which precipitated the Child's removal still persisted. On appeal, Mother does not challenge the trial court's termination of her parental rights based upon this statutory ground. However, we must review the trial court's findings as to this ground for termination. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) (holding that the Court of Appeals "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest, regardless of whether the parent challenges these findings on appeal").

Tennessee Code Annotated section 36-1-113(g)(3) authorizes termination of parental rights when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and;
> > (A) The conditions that led to the child's removal or other condition that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or a guardian or guardians, still persist;
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or a guardian or guardians in the near future; and
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

In its final judgment terminating Mother's parental rights, the trial court made the following findings of fact regarding the persistence of conditions:

> Pursuant to T.C.A. § 36-1-113(g)(3), [the Child] has been in the custody of the State of Tennessee, Department of Children's Services for more than six (6) months preceding the filing of this petition, and the conditions which led to removal still persist and other conditions exist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's safe return to the care of

- 14 -

Respondents [Mother] and [Father].  Further, there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to either Respondent in the near future; the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; and continuation of the legal parent and child relationship is not in said child's best interest.  The Respondents have not made such a lasting adjustment as to enable the child to be returned to either parent safely.

The record reflects that the trial court removed the Child from Mother's custody on August 14, 2012 due to educational neglect.  On November 7, 2013, the trial court adjudicated the Child dependent and neglected and found that it was "contrary to the child[']s welfare to remain in the custody of [his] mother[.]"  DCS filed the petition to terminate Mother's parental rights on June 23, 2015, approximately thirty-four months after the Child entered DCS custody.  Thus, the six-month requirement was satisfied.

With regard to the remaining factors, Mother demonstrated few signs of addressing her mental health issues.  Mother complied with the psychological evaluation requirement.  However, for nearly four years prior to trial, she failed to attend the case management services recommended by Dr. Massey and repeatedly included in the permanency plans.  Mother appeared unaware of the exact nature of her mental health diagnosis and denied that she had a mental health condition.  Moreover, Mother refused to accept responsibility for failing to send the Child to school for over 100 days.  She failed to establish a stable home to which the Child could be safely returned.  Mother resided with her brother, whom Ms. Dortch did not believe was mentally stable.  Based on thirty years of experience as a family service worker, Ms. Dortch felt it was not safe for the Child to be placed in that home.  Mother could not obtain separate housing until she paid her outstanding utility bill.  Mother had known about the $1,400 outstanding bill since 2013 but had made no progress towards paying it by the time of trial; she claimed that she planned to pay $200 per month towards the bill until it was paid in full.  This evidence supports the trial court's finding that the conditions which led to removal still persisted, that a reasonable probability existed that the Child would be subjected to further neglect if he were returned to Mother's home, and that there was little likelihood that the conditions that led to the Child's removal would be remedied at an early date. Tenn. Code Ann. § 36-1-113(g)(3)(A) & (B).

The Child resided in a foster home where the foster parents diligently worked with him to improve his performance in school.  Furthermore, the foster parents wanted to adopt the Child.  Therefore, a continuation of Mother's parental rights would negatively affect the "[C]hild's chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(C).  After a thorough examination of the record, we conclude that DCS proved the existence of persistent conditions by clear and convincing

evidence and that the trial court did not err in terminating Mother's parental rights on this ground.

Best Interest of the Child

Having determined that clear and convincing evidence of statutory grounds exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination is in the Child's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d 838, 860. When a trial court considers whether terminating a parent's rights to a child is in the child's best interest, a trial court shall consider the following non-exclusive factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The trial court made the following findings of fact when determining it was in the best interest of the Child to terminate Mother's parental rights:

Pursuant to T.C.A. § 36-1-113(i)(1)-(9), termination of parental rights is in the best interest of the child. Specifically, the Court makes the following findings of fact that termination is in the child's best interest in regard to [Mother] under the following factors set out in the statute:

a. Pursuant to T.C.A. § 36-1-113(i)(1), [Mother] has not made an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home.

b. Pursuant to T.C.A. § 36-1-113(i)(2), [Mother] has not made a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. The Court finds that the Department has made reasonable efforts to assist [Mother].

c. Pursuant to T.C.A. § 36-1-113(i)(3), the Court finds that [Mother] has maintained regular visitation with the child.

d. Pursuant to T.C.A. § 36-1-113(i)(4), the Court finds that a meaningful relationship has been established between [Mother] and her child, but [the Child] has a very strong bond with the foster parents . . . .

e. Pursuant to T.C.A. § 36-1-113(i)(5), the Court finds that a change of caretakers and physical environment would have a negative impact on the child's emotional, psychological, and medical condition. The child has bonded strongly to the fosters parents and a change in placement would adversely affect him. [The Child] has an IEP ("Individualized Education Program"), and [Foster Mother] works with him on his education plan. [The Child's] older brother Micheal is also in the [foster] home under the Extension of Foster Care program, and he also helps [the Child] when needed. [Foster Mother] is very nurturing with [the Child] and has helped him improve his educational performance since he was placed in her home. [The Child] testified that he wants to be adopted by [the foster parents].

f. Pursuant to T.C.A. § 36-1-113(i)(6), the Court finds that [Mother] has not committed brutality toward the child, but she has neglected his educational needs and failed to take responsibility for her role in his truancy.

g. Pursuant to T.C.A. § 36-1-113(i)(7), the Court does find that [Mother's] home environment is unhealthy and unsafe but that [Mother] does not use illegal substances. However, her mental health has rendered her consistently unable to care for [the Child] in a safe and stable manner. The maternal uncle residing in the

- 17 -

mother's home has untreated paranoid schizophrenia. The Court specifically credits Rita Dortch's testimony that this is a barrier to placing [the Child] with [Mother].

h. Pursuant to T.C.A. § 36-1-113(i)(8), the Court finds that [Mother's] mental and emotional status would be detrimental to the child and prevent her from providing a safe and stable care and supervision for the child. [Mother] was diagnosed with Personality Disorder, Not Otherwise Specified, in 2014, which continues to be a barrier to reunification.

i. Pursuant to T.C.A. § 36-1-113(i)(9), the Court finds that [Mother] has not paid child support consistent with the child support guidelines but token support has been provided.

We conclude that the record supports the trial court's findings, as set forth above, and that DCS has proven by clear and convincing evidence that terminating Mother's parental rights is in the child's best interest.

CONCLUSION

The judgment of the trial court is affirmed in all respects. Costs of appeal are assessed against appellant, Brenda K.A., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE